NO. 12-02-00052-CV



IN THE COURT OF APPEALS



TWELFTH COURT OF APPEALS DISTRICT


 

TYLER, TEXAS


 

TYSON FOODS, INC.,
§
 APPEAL FROM THE 123RD

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


GUSTAVO TOVAR GUZMAN,

APPELLEE
§
 PANOLA COUNTY, TEXAS






OPINION


 Following a jury trial, Appellant Tyson Foods, Inc. ("Tyson") was ordered to pay Appellee
Gustavo Tovar Guzman ("Guzman") $745,496.41 in damages for injuries he sustained while
catching chickens that were destined for processing by Tyson. In three issues, Tyson challenges two
of the trial court's evidentiary rulings and argues that the evidence is legally and factually insufficient
to support the jury's finding of negligence and the amount of damages it awarded Guzman for lost
earning capacity. We affirm.


Background

 Tyson subcontracted with Jerry Collum ("Collum") to provide labor for catching chickens
at various farms for future processing at Tyson's plants. Guzman was one of Collum's employees
and had been working for him for nine years as a chicken catcher. The chicken-catching process
involves a crew leader and five "catchers" who enter the chicken house and corral the chickens to
one side of the house. A Tyson employee then drives a forklift carrying a large cage into the chicken
house. When the forklift driver enters the chicken house with the cage, the operator looks for the
"block man" who then directs the operator where to go. The block man is also responsible for
placing a large steel block on the ground onto which the operator sets one end of the cage which in
turn causes the cage to rest at an angle that keeps the chickens from escaping from the cage. After
the operator sets the cage on the block, the driver backs the forklift out from under the empty cage
and then either backs out of the chicken house to retrieve another cage or, if there is a cage already
full of chickens, picks up the full cage with the forklift and removes it from the chicken house.

 On July 30, 1998, Guzman was in the process of rounding up chickens when Brian Jones
("Jones"), a Tyson employee, ran into Guzman with a forklift. As a result of the accident, Guzman
suffered spinal and nerve damage and endured a potentially paralyzing surgery to regain some limb
movement. Guzman now has a physical handicap and is limited to working in minimum-wage jobs. 
 Guzman sued Tyson, claiming that the accident was caused by the negligence of Tyson and
its employee. Guzman's case went to trial on October 23, 2001, and on October 26, the jury
rendered its verdict. The jury found both parties negligent and attributed 80% of the fault to Tyson
and 20% to Guzman. The jury further awarded Guzman $931,870.51 in damages ($425,000.00 for
past physical pain and mental anguish, $150,000.00 for future physical pain and mental anguish,
$10,000.00 for past physical impairment, $10,000.00 for future physical impairment, $51,870.51 for
past medical care, $5,000.00 for future medical care, $70,000.00 for past lost earning capacity, and
$210,000.00 for future lost earning capacity). After deducting 20% of the total jury award for
Guzman's own negligence, the trial court's final judgment awarded Guzman $745,496.41. The final
judgment was signed by the trial court on November 5, and Tyson filed a motion for new trial on
December 5. This motion was overruled by operation of law, and Tyson filed a notice of appeal on
January 31, 2002. This appeal followed.


Admission of Tyson's Subsequent Remedial Measures 

 In its first issue, Tyson argues that the trial court committed reversible error by allowing
Guzman to show the jury various safety precautions Tyson implemented after Guzman's accident
to prevent this type of accident from happening in the future. Tyson contends that this evidence was
prejudicial to its defense and was not admissible because the Texas Rules of Evidence do not permit
the introduction of safety precautions taken after an accident. Guzman maintains that the trial court
did not err in allowing him to introduce the later safety measures into evidence because Tyson
disputed that it exercised control over the chicken-catching operation; therefore, the exception to the
general rule applies.

 At the time of the accident, Tyson did not require the chicken-catchers to wear reflective
vests, even though these operations were conducted at dark. Tyson also did not have any system of
guidelines or procedures in place to prevent accidents such as the one involving Guzman. At trial,
the trial court admitted evidence offered by Guzman that Tyson required its subcontractors'
employees to wear reflective vests during the chicken-catching operations. The trial court also
admitted evidence that Tyson imposed new procedures on its subcontractors' employees that
governed the employees' movement and activities during the chicken-catching operation. 

 Tyson objected to this evidence at trial and argued that the evidence directly contravened rule
407 of the Texas Rules of Evidence, which limits evidence of subsequent remedial measures,
because it was offered to show that Tyson was negligent on the day of the accident. Guzman
countered Tyson's argument by contending that the exception to rule 407 applies in this case because
the evidence was offered to show that Tyson had exercised control over the chicken-catching
operations. 

Standard of Review and Governing Law

 The admission or exclusion of evidence is a matter within the discretion of the trial court. 
Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998). In order for an
appellant to obtain a reversal based on a trial court's error in the admission or exclusion of evidence,
it must be demonstrated that the ruling was error and that the error was calculated to cause and
probably did cause the rendition of an improper judgment. Tex. R. App. P. 44.1; Malone, 972
S.W.2d at 43. The appellate court must review the entire record when making this determination. 
Interstate Northborough Partnership v. State, 66 S.W.3d 213, 220 (Tex. 2001). Reversible error
does not usually occur in connection with rulings on questions of evidence, unless the appellant can
demonstrate that the whole case turns on the particular evidence admitted or excluded. Id.

Analysis

 Rule 407(a) of the Texas Rules of Evidence states as follows:


 (a) Subsequent Remedial Measures. When, after an event, measures are taken which, if taken
previously, would have made the event less likely to occur, evidence of the subsequent remedial
measures is not admissible to prove negligence or culpable conduct in connection with the event. This
rule does not require the exclusion of evidence of subsequent remedial measures when offered for
another purpose, such as proving ownership, control or feasibility of precautionary measures, if
controverted, or impeachment. Nothing in this rule shall preclude admissibility in products liability
cases based on strict liability.


Tex. R. Evid. 407(a).

 The trial court permitted Guzman to introduce pictures and a videotape of workers involved
in the chicken-catching process. The pictures and the video, taken two and a half years after the
accident in December 2000, depicted workers in reflective vests rounding up chickens. Tyson
contends that the video shows the changes Tyson made in its safety policy following the accident. 
The trial court also allowed Guzman, his brother, and Wayne Seelbach ("Seelbach"), Guzman's
safety expert, to testify that Tyson had implemented the safety vests and safer methods of rounding
up the chickens after Guzman's accident. Specifically, Guzman testified that the vests worn in the
December 2000 video were not being worn on the date of Guzman's accident. Guzman also testified
that Tyson changed the chicken-catching procedures to require the block man and the catchers to
wear reflective vests and that Tyson changed the way in which the block man and the catchers
positioned themselves around a moving forklift. 

 Guzman's brother, Jose Ramiro Tovar ("Tovar"), reiterated that after Guzman's accident,
Tyson instituted rules requiring workers to wear reflective vests and changing the way block men
and catchers positioned themselves during the process. Seelbach testified that the changes came
about as the result of a corporate safety analysis performed by Tyson after the accident. Seelbach
further stated that Tyson had "two ways of doing it before the accident and after the accident," and
that "what they did with the reflective vest is a good step. That would have been good to initiate."

 Guzman also introduced a document dated February 1, 1999, entitled "Live Haul and
Catching Safety." This document sets out the policies and procedures that Tyson employees and
"any others who work around [them]" must follow when catching chickens. It requires all workers
to wear reflective vests and requires the forklifts to have a "working reverse alarm" and "amber
flashing lights." The document also sets forth the procedure for moving from one side of the house
to the other after a cage has been filled with chickens: "All catchers except the block man will
remain on the side of the house with the full cage until the empty cage has been set down. Only after
the empty cage has been set down may the catchers move towards the side of the house where the
empty cage is located." After Guzman introduced this document into evidence, Seelbach testified
that Tyson should have taken these safety precautions before the accident. 

 Guzman also focused on Tyson's subsequent remedial measures when cross-examining
Jones. He admitted that the measures Tyson took after the accident made the process "a lot safer." 
Guzman reiterated Tyson's subsequent measures during the cross-examination of Mitch Menefee
("Menefee"), a Tyson supervisor. Menefee testified that he had a meeting with his supervisor after
the accident and that they decided to make the changes in catching procedure and the use of
"personal protective equipment." Menefee also said that the catchers were going to be required to
wear reflective vests in future operations "in order to increase their visibility to the driver/forklift
operators." 

 Guzman recognizes that in the general contractor/independent contractor relationship, a
general contractor does not owe a duty to ensure that an independent contractor performs its work
in a safe manner. See Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 783 (Tex. 2002). 
However, he also asserts that a duty does arise if the general contractor retains some control over the
manner in which the independent contractor performs its work. Id. 

 Guzman maintains that Tyson "vigorously contested" the issue of control throughout the trial. 
Moreover, Guzman argues that because "control" was a controverted issue in this case, the exception
to rule 407(a) applies in this case and the trial court properly admitted the evidence. Tyson, on the
other hand, contends that it stipulated to the issue of control during a pre-trial objection to the
subsequent remedial measures. In its brief, Tyson states that it stipulated that Tyson "has a degree
of control sufficient to allow them to exercise control over the manner and means by which the third
party contractors accomplish the objective of the contract," including "sufficient control to require
workers to wear a reflective vest." Tyson also argues that it had never contested the issue of
feasibility. 

 Guzman argues that the questions and statements Tyson's counsel propounded to the various
witnesses and to the court establishes that the issue of control remained a controversy during trial. 
Guzman also contends that Tyson did not properly stipulate to any issue of control because its
attempt to stipulate to some areas of control and not others made the stipulation vague and
incomplete. Because the stipulation was vague and incomplete, Guzman maintains that the issue of
control remained a contested one and was open to review by the jury. See Shepherd v. Loweth, 962
S.W.2d 28, 37 (Tex. 1998); Herschbach v. City of Corpus Christi, 883 S.W.2d 720, 734 (Tex.
App.- Corpus Christi 1994, writ denied). 

 Guzman points to the following exchange that took place at the bench between Tyson's
counsel and the court in support of his contention that control was controverted:


 TYSON'S COUNSEL: Your Honor, we have one very brief matter we can take up at the bench-


 THE COURT: All right. (Conference at the bench as follows:)


 TYSON'S COUNSEL: Defendant Tyson Foods renews its objection to any evidence that might 

 be offered by plaintiff that would either directly or by implication reveal to this jury that there has

 been any nature or any type of a subsequent remedial measure. 


 Particularly, we think there may be testimony or a video that would show that the catchers
are now required to wear reflective vests which enhances their visibility in the low light conditions that
typically prevail in the chicken house. We believe that that is squarely within the rule concerning
subsequent remedial measures. 


 [Guzman's counsel] has indicated that he thinks that it is admissible under an exception to
that rule in that it goes to show control. Tyson does not dispute that it has sufficient control over the
conduct within the chicken houses to require the workers to wear a reflective vest, much in the same
way that an oil company has sufficient control over its drilling locations and other facilities to require
employees of third party contractors to wear steel-toed boots or hard hats or safety glasses. 


 Tyson does not acknowledge that it has a degree of control sufficient to allow them to
exercise control over the manner and means by which the third party contractors accomplish
the objective of the contract. (Emphasis added).


 But they do have sufficient control to require the workers to wear a reflective vest. Tyson
is willing to stipulate to that degree of control. Therefore, it is no longer a contested issue. And
[Guzman's counsel] cannot rely on that exception to the rule against evidence of subsequent remedial
measures.


 Guzman argues that Tyson contested the issue of control in other parts of the trial, namely
in its cross-examination of Tovar and Collum. During Tyson's cross-examination of Tovar, the
following exchange took place:



 When you were working in the chicken houses at eleven years old, you weren't working as a Tyson
employee, were you? 



 A: I was working for Jerry Collum. Tyson I think.


 Q: So you were working for Jerry Collum, is that right?


 A: I was eleven years old. I didn't know who I was working for. I just know that Jerry give me
my check.


 Q: So you were working for Jerry Collum, not Tyson, right?


 A: Tyson, yes.


 Q: Who are you working for now? Jerry Collum?


 A: Yes, sir.

 

 Q: Are you working for the same person now that you were working for when you were eleven
years old?


 A: Yes, sir.


 Q: So you were working for Jerry Collum when you were eleven years old, right?


 A: Yes, sir.


 During Tyson's examination of Collum, the following exchange took place:



 When your crew is in a house catching chickens, who directs your crew on what to do?




 Well, my lead hand does.




 And when your crew is in the house, in a house catching chickens, who's responsible for your
crew's safety?




 Well, I depend on my lead hand.




 Do you consider it to be Tyson's responsibility to tell your crew how to catch chickens?




 No, it's not.



 Tyson, on the other hand, asserts that Brookshire Brothers, Inc. v. Lewis, 911 S.W.2d 791
(Tex. App.- Tyler 1995, writ denied), controls the outcome of this case. In Lewis, the plaintiff sued
Brookshire's when an automobile driven by a third party crashed through the front of the store and
injured him. Lewis, 911 S.W.2d at 793. The jury determined that Brookshire's was negligent in not
providing any barriers or other protective devices to prevent cars from rolling from the parking
spaces into, and potentially through, the storefront. Id. At trial, the jury heard evidence from one
of the plaintiff's expert witnesses that Brookshire's had erected "bollards," which are concrete-filled
steel pipes set vertically in front of the parking spaces, at a similar store to prevent cars from crashing
into the front of the store. Id. at 796. The record also showed that the similar store was built eight
to nine months after Lewis's accident and that Brookshire's employees testified that Lewis's accident
was a factor in the decision to install the bollards there. Id.

 In Lewis, we noted that although the evidence clearly concerned subsequent remedial actions
by Brookshire's, Lewis claimed that the evidence was offered to meet the exception to rule 407(a). 
Lewis argued that the evidence was not offered to show negligence, but was offered to prove the
feasibility of precautionary measures. Id. Lewis further contended that Brookshire's denied the
feasibility of any protective devices to prevent a similar accident and cited eight pages of the
statement of facts to support his claim. Id. 

 In addressing the issue, we acknowledged that evidence of subsequent remedial measures
may be admitted when it is not offered to show negligence or culpable conduct, but instead is offered
to prove ownership, control or feasibility of precautionary measures, if controverted. Id. at 795. We
reviewed the pages cited by Lewis and found no evidence offered by Brookshire's to refute the
feasibility of the cost or efficacy of the protective measures such as the bollards installed at the
second store. Id. at 796. After searching the record for evidence of a refutation by Brookshire's and
finding none, we held that the proof of the subsequent remedial measures was not intended to
address such a refutation and therefore should not have been admitted. Id.

 In analyzing whether the evidentiary ruling required a reversal, we noted that Brookshire's
defense was that it had no duty to guard against the danger to customers from vehicles crashing into
Brookshire's store because such occurrences are so rare that they could not be reasonably foreseen
in the light of ordinary experience. Id. Since the erroneously admitted evidence struck at the heart
of Brookshire's defense and was a recognition of the concern that Brookshire's contended to be rare
and unforeseeable, the admission of that evidence was reasonably calculated to erode Brookshire's
position in the case and was harmful. Id. Therefore, the case was reversed and remanded for a new
trial. Id.

 The facts of the instant case are distinguishable from the facts in Lewis. Here, Tyson did not
stipulate to all areas of control. It specifically told the court that "Tyson does not acknowledge that
it has a degree of control sufficient to allow them to exercise control over the manner and means by
which the third party contractors accomplish the objective of the contract." The first element that
must be proven in an action for negligence is that a legal duty was owed to the plaintiff by the
defendant. Harrison, 70 S.W.3d at 783. Ordinarily, a general contractor does not owe a duty to
ensure that an independent contractor performs his work in a safe manner. Id. (citing Elliott-Williams Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999)). A duty does arise, however, if the general
contractor retains some control over the manner in which the independent contractor performs its
work. Id. (Emphasis added). Section 414 of the Restatement (Second) of Torts, which the
supreme court adopted in Redinger v. Living, Inc., 689 S.W.2d 415, 418 (Tex. 1985), further
explains this principle:


 One who entrusts work to an independent contractor, but who retains the control of any part of the
work, is subject to liability for physical harm to others for whose safety the employer owes a duty to
exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.


Restatement (Second) of Torts § 414 (1965); Harrison, 70 S.W.3d at 783. Under the supreme
court's decision in Redinger, a general contractor may owe a duty of reasonable care to a
subcontractor's employee, and consequently may be liable for injury to that employee, if the general 
contractor retains control over part of the work to be performed: "[W]hen the general contractor
exercises some control over a subcontractor's work he may be liable unless he exercises reasonable
care in supervising the subcontractor's activity." Id. (citing Redinger, 689 S.W.2d at 418).

 Because Tyson did not stipulate, and thereby denied, that it "ha[d] a degree of control
sufficient to allow [it] to exercise control over the manner and means by which the third party
contractors accomplish the objective of the contract," Guzman was left to prove that Tyson owed
him a legal duty. Under Harrison and Redinger, the only way that he could do that was to prove
that Tyson exercised control over the manner in which Collum's employees performed their work. 
By refusing to stipulate to the "manner and means" by which Collum's employees performed their
work, the issue of control was controverted and the evidence of subsequent remedial measures was
properly admitted. See Exxon Corp. v. Roberts, 724 S.W.2d 863, 869 (Tex. App.- Texarkana 1987,
writ ref'd n.r.e.); Hull v. Chevron U.S.A., 812 F.2d 584, 587 (10th Cir. 1987). Tyson's first issue
is overruled.


Admission of Expert Testimony on Lost Earning Capacity

 In its second issue, Tyson contends that the trial court erred when it refused to exclude Dr.
Carl Hansen, Guzman's expert witness on his lost earning capacity, because the foundation upon
which Dr. Hansen based his opinion was unreliable. Specifically, Tyson argues that Dr. Hansen
erroneously assumed that Guzman was legally entitled to work in the United States. Because
Guzman was not a United States citizen and was not otherwise authorized to work in the United
States, Tyson concludes that he was not entitled to receive any compensatory award for lost earning
capacity. Guzman maintains that the trial court did not err in allowing his expert to testify as to his
lost earning capacity because Texas law does not require citizenship or the possession of an
immigration work permit as a prerequisite to recovering damages for lost earning capacity.

Standard of Review

 A two-part test governs whether expert testimony is admissible: (1) the expert must be
qualified; and (2) the testimony must be relevant and based on a reliable foundation. Helena Chem.
Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex.2001). Whether the trial court properly admitted expert
testimony is subject to an abuse of discretion standard of review. Id.; E.I. du Pont de Nemours and
Co. v. Robinson, 923 S.W.2d 549, 558 (Tex.1995). The test for abuse of discretion is whether the
trial court acted without reference to any guiding rules or principles. Robinson, 923 S.W.2d at 558;
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.1985). The test is not
whether, "in the opinion of the reviewing court, the facts present an appropriate case for the trial
court's action." Robinson, 932 S.W.2d at 558. A reviewing court cannot conclude that a trial court
abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court
committed a mere error in judgment. Id. Although the trial court serves as an evidentiary gatekeeper
by screening out irrelevant and unreliable expert evidence, it has broad discretion to determine the
admissibility of that evidence. Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623, 629 (Tex.2002)
(citing Robinson, 923 S.W.2d at 556). We must uphold the trial court's evidentiary ruling if there
is any legitimate basis for it. Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43
(Tex.1998).

Analysis 

 Tyson cites the recent United States Supreme Court case of Hoffman Plastic Compounds,
Inc. v. National Labor Relations Board, 535 U.S. 137, 122 S. Ct. 1275, 152 L. Ed. 271 (2002) for
the proposition that "national public policy, as expressed by the United States Congress in enacting
immigration reforms, militates against any award of wages as damages to undocumented alien
laborers."

 In Hoffman, Jose Castro, an undocumented alien worker, was laid off for supporting a union-organizing campaign at Hoffman Plastic Compounds, Inc. ("Hoffman"). Id. at 140. Three years
later, the National Labor Relations Board ("NLRB") found that the layoff violated the National
Labor Relations Act ("NLRA") and awarded Castro back pay and reinstatement at the company. An
administrative law judge ("ALJ") then conducted a hearing to determine how much back pay
Hoffman owed Castro. Id. at 141. During the hearing, Castro testified that he was born in Mexico
and that he had never been legally admitted to, or authorized to work in, the United States. He also
admitted that he obtained employment with Hoffman after he tendered a birth certificate belonging
to a friend who was born in Texas. He also admitted that he used this birth certificate to fraudulently
obtain a California's driver's license, a Social Security card, and to fraudulently obtain employment
after he was laid off by Hoffman. Id. No evidence was presented to the judge to show that Castro
had applied or intended to apply for legal authorization to work in the United States. Based on this
testimony, the ALJ reversed the NLRB's award of reinstatement and back pay to Castro. The ALJ
determined that such relief would be contrary to the Supreme Court's holding in Sure-Tan, Inc. v.
National Labor Relations Board, 467 U.S. 883, 104 S. Ct. 2803, 81 L. Ed. 2d 732 (1984) (1) and in
conflict with Immigration Reform and Control Act of 1986 ("IRCA"), which makes it unlawful for
employers to knowingly hire undocumented workers or for employees to use fraudulent documents
to establish employment eligibility. See 8 U.S.C.A. § 1324a (West 2002). 

 The NLRB reversed the ALJ's decision to award back pay, and the D.C. Court of Appeals
denied Hoffman's petition for review. The Supreme Court reversed the NLRB's decision, noting
that Congress expressly made it criminally punishable for an illegal alien to obtain employment with
false documents or for an employer to knowingly hire an undocumented alien worker. Hoffman,
535 U.S. at 149. Therefore, the Court held that an award of back pay by the NLRB to illegal aliens
would "unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as
expressed in the IRCA." Id. at 151.

 Tyson argues that the Court's holding in Hoffman demonstrates a federal congressional
policy to refrain from awarding undocumented alien workers compensation for lost earning capacity. 
We disagree. First, this holding only applies to an undocumented alien worker's remedy for an
employer's violation of the NLRA and does not apply to common-law personal injury damages. 
Next, Texas law does not require citizenship or the possession of immigration work authorization
permits as a prerequisite to recovering damages for lost earning capacity. See Wal-Mart Stores, Inc.
v. Cordova, 856 S.W.2d 768, 770 n.1 (Tex. App.- El Paso 1993, writ denied). Third, Tyson's
contention seems to be in the nature of a federal preemption defense, which is an affirmative defense
and must be raised in the trial court. See Whitten v. Vehicle Removal Corp., 56 S.W.3d 293, 298
(Tex. App.- Dallas 2001, pet. denied) (citing Gorman v. Life Ins. Co. of N. Am., 811 S.W.2d 542,
545-96 (Tex. 1991)). Tyson did not raise this affirmative defense in the trial court; therefore, it is
waived. Id. 

 Dr. Hansen's opinion was not unreliable because Guzman was entitled to receive
compensation for lost earning capacity even though he is not a citizen of the United States. Texas
law clearly allows for the recovery of damages for lost earning capacity, regardless of the claimant's
citizenship or immigration status. Therefore, the trial court did not err in overruling Tyson's motion
to exclude Dr. Hansen's opinions. Tyson's second issue is overruled.


Legal and Factual Sufficiency

 In its third and final issue, Tyson argues that the evidence is legally and factually insufficient
to support the jury's finding that Tyson was negligent and that Guzman was entitled to damages for
his lost earning capacity. Guzman contends that the evidence is legally and factually sufficient to
support the challenged jury findings.

Standard of Review 

 In reviewing a legal sufficiency or no evidence complaint, the appellate court must consider
only the evidence and inferences tending to support the challenged findings and disregard all
evidence and inferences to the contrary. If there is more than a scintilla of evidence to support the
challenged findings, the no evidence challenge fails. Leitch v. Hornsley, 935 S.W.2d 114, 118 (Tex.
1996). We may only sustain a "no evidence" point when the record discloses one of the following:
(1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or
evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence
offered to prove a vital fact is no more than a mere scintilla of evidence, or (4) the evidence
establishes conclusively the opposite of a vital fact. See Merrell Dow Pharmaceuticals, Inc. v.
Havner, 953 S.W.2d 706, 711 (Tex. 1997). It is not within our province to second guess the fact
finder unless only one inference can be drawn from the evidence. See Havner v. E-Z Mart Stores,
Inc., 825 S.W.2d 456, 461 (Tex. 1992). If the evidence furnishes some reasonable basis for differing
conclusions by reasonable minds about a vital fact's existence, more than a scintilla of evidence
exists. Burroughs Wellcome v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Kindred v. Con/Chem,
Inc., 650 S.W.2d 61, 63 (Tex. 1983).

 When conducting a factual sufficiency review, we must consider all of the evidence,
including any evidence contrary to the verdict. Plas-Tex. Inc. v. U.S. Steel Corp., 772 S.W.2d 442,
445 (Tex. 1989). Furthermore, we must reverse on the basis of factual insufficiency if the court's
finding is so against the great weight and preponderance as to be manifestly unjust. Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). This court is not a fact finder and may not pass on
the credibility of the witnesses or substitute its judgment for that of the trier of fact, even if a
different conclusion could be reached on the evidence. See Herbert v. Herbert, 754 S.W.2d 141,
144 (Tex. 1988); Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex. App.-Dallas 1986, writ ref'd
n.r.e.). When a party without the burden of proof on an issue challenges the factual sufficiency of
the evidence, the question is whether insufficient evidence supports the complained-of finding. 
Gooch v. Am. Sling Co., 902 S.W.2d 181, 184 (Tex. App.- Fort Worth 1995, no writ). An assertion
that the evidence is "insufficient" to support a fact finding means that the evidence supporting the
finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set
aside and a new trial ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.1965). 

Analysis

 Tyson argues that the record is devoid of legally and factually sufficient evidence to support
the jury's verdict that it was negligent and that Guzman was entitled to compensation for lost earning
capacity. Tyson contends that although Guzman proved that an accident occurred, such proof is no
evidence that what Tyson's employee did constituted a breach of the duty of care. Specifically,
Tyson asserts that no evidence exists that its failure to institute the new policies and procedures was
a "cause in fact" or "but for" cause of the accident. Therefore, Tyson concludes, since Guzman
failed to prove those two essential elements of a negligence cause of action, he did not prove that any
breach of the duty of care by Tyson was a proximate cause of the accident.

 With respect to the jury's award of lost earning capacity, Tyson maintains that the evidence
was legally and factually insufficient to support such an award because Guzman was not legally
entitled to receive lost earning capacity. In support of this contention, Tyson relies on the Hoffman
decision.

 Proximate Cause

 Proximate cause incorporates two elements: foreseeability and cause in fact. Doe v. Boys
Clubs of Greater Dallas, 907 S.W.2d 472, 477 (Tex.1995). Foreseeability requires only that the
general danger, not the exact sequence of events producing the harm, be foreseeable. Walker v.
Harris, 924 S.W.2d 375, 377 (Tex. 1996). The test for foreseeability is whether a person of ordinary
intelligence would have anticipated the danger his or her negligence creates. Doe, 907 S.W.2d at
478. As an element of proximate cause, cause in fact means that the negligent act or omission was
a substantial factor in bringing about the injury and without which no harm would have been
incurred. Id. at 477. Proximate cause may be determined from circumstantial evidence. Brown v.
Goldstein, 685 S.W.2d 640, 642 (Tex.1985).

 At trial, Seelbach testified that Jones did not operate his forklift safely on the day of the
accident and that Tyson failed to provide Guzman with a safe place to work. With regard to Jones's
driving, Seelbach noted that Jones failed to comply with Tyson's instructions to its forklift drivers,
instituted after Guzman's accident, instructing the drivers to "never allow catchers to move behind
the forklift or otherwise out of sight." Seelbach further testified that the workers should have been
instructed to not catch any chickens until the cage had been set down at the place where the block
man indicated and the forklift started to back out of the chicken house. In Seelbach's opinion, Tyson
failed to perform a job safety analysis that would have led to the implementation of a policy or
procedure requiring the chicken catchers to 1) wear protective clothing and 2) move to one side of
the chicken house until the block man put the empty cage on the ground. Seelbach also opined that
the accident would not have happened if Tyson's forklift driver had complied with Tyson's own
rules and procedures for operations as set forth in Tyson's safety video, training manual and
handbook. Had Tyson furnished its employees with reflective vests and implemented safety
procedures for catching the chickens prior to the accident, Seelbach believed that such a measure
would have given Jones the opportunity to see the chicken catchers more clearly while they were
working in the dark. Therefore, according to Seelbach, this accident would not have occurred. 

 Jones (the forklift driver), Tyson's employee, admitted at trial that he has to accept some of
the responsibility for this accident because he "was running the machine." He also admitted that had
he did not sense that Guzman was in front of him and that if he had, he would have stopped. 

 We hold that the testimony of Seelbach is more than a scintilla of evidence that the jury could
have relied on to come to the conclusion that Tyson's failure to implement safe chicken-catching
policies was a substantial factor and, accordingly, a cause-in-fact of the accident. From that
testimony, the jury could have reasonably concluded that had Tyson implemented a policy until the
empty cage was placed on the block in the middle of the chicken house, the accident would not have
occurred. Furthermore, the jury could have relied on the testimony of Jones, who admitted that he
was partly responsible for the accident.

 Furthermore, Seelbach also stated that the way Tyson performed this operation was a "recipe
for disaster" because of the "low light conditions, crowded conditions," with people that may not
necessarily understand the work scope totally, the lack of a pre-job meeting, and the failure to
perform a job safety analysis. Without such policies in place, and knowing that the chicken-catching
operation is conducted at dark, Seelbach's testimony is also more than a scintilla of evidence that
Tyson should have been aware of the general danger that one of the chicken catchers could be hit
by a forklift carrying an empty cage. Therefore, the evidence is legally sufficient to support the
jury's finding that Tyson's negligence was foreseeable and was the cause-in-fact of Guzman's
injuries.

 With regard to Tyson's factual insufficiency issue, Tyson does not direct us to any evidence
to contradict the evidence offered to support Guzman's negligence claim. However, after a review
of the record, we note that the only evidence that Tyson offered to contradict the foreseeability
element was the testimony of Tim Hooper ("Hooper"), the complex personnel manager for Tyson's
Carthage, Texas operations. Hooper testified that out of all of Tyson's chicken-catching operations
over the past twenty years, he only knew of one incident where a chicken catcher was injured by a
forklift carrying a chicken cage. Although this is some evidence from which a jury could have
possibly inferred that Tyson could not foresee an accident similar to the one involving Guzman, this
evidence is not so overwhelming that the jury's verdict should be set aside. Therefore, the evidence
was factually sufficient to support the jury's finding of negligence.

 Lost Earning Capacity

 Tyson complains that the evidence was legally and factually insufficient to support the jury's
award of past and future lost earning capacity. In support of its argument, Tyson relies on the
Hoffman decision for the proposition that Guzman was not legally entitled to obtain wages in the
United States and therefore is not legally entitled to collect damages for lost earning capacity. 
Because he was not legally entitled to collect damages for lost earning capacity, Tyson argues that
there is no evidence to support the jury's award of such damages.

 As we stated previously, Texas law does not require citizenship or the possession of
immigration work authorization permits as a prerequisite to recovering damages for lost earning
capacity. See Cordova, 856 S.W.2d at 770, n.1. Therefore, the fact that Guzman was not a United
States citizen at the time of the accident has no bearing on his ability to recover damages for lost
earning capacity. Tyson's third issue is overruled.

Conclusion

 At trial, Tyson expressly denied that it exercised control over the manner and means by
which the chicken catchers accomplish their objective; therefore, the evidence of Tyson's subsequent
remedial measures was properly admitted. The issue of whether Guzman is a United States citizen
is immaterial to the determination of his damages for lost earning capacity. Dr. Hansen's failure to
take into account that Guzman is not a United States citizen does not render his opinion on
Guzman's lost earning capacity unreliable. Furthermore, the evidence adduced at trial was legally
and factually sufficient to support the jury's finding that Tyson's negligence proximately caused
Guzman's injuries.

 Accordingly, the trial court's judgment is affirmed.

 SAM GRIFFITH 

 Justice

Opinion delivered July 31, 2003.

Panel consisted of Worthen, C.J., Griffith, J. and Ramey, Jr., Retired Chief Justice, Twelfth Court of Appeals, sitting
by assignment.


(PUBLISH)
1. In Sure-Tan, the Supreme Court set aside an award of back pay and reinstatement to undocumented alien
workers who were not authorized to re-enter this country following their voluntary departure when their employers
unlawfully reported them to the Immigration and Naturalization Service in retaliation for union activity. Sure-Tan,
467 U.S. at 903, 104 S. Ct. at 2815. The Court found that the NLRB's authority to select remedies was limited by
federal immigration policy as expressed in the Immigration and Nationality Act (INA), and held that in order to
avoid a potential conflict with the INA with respect to back pay, the employees must be deemed "unavailable" for
work (and the accrual of back pay therefore tolled) during any period when the employees were not "lawfully
entitled to be present and employed in the United States." Id., 467 U.S. at 903, 104 S. Ct. at 2815.