**REPUBLIC WASTE SERVICES, LTD. and Marco Castaneda, Appellants,**

v.

**Elida Griselda MARTINEZ, Individually and a/n/f of Amalia Griselda Gomez, a Minor, and on Behalf of the Estate of Oscar Alfredo Gomez, Deceased, and Carlos Gomez Portillo, Appellees.**

No. 01–09–00236–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 20, 2011.

Constance H. Pfeiffer, Beck, Redden & Secrest, L.L.P., Houston, for Appellants.

Bernardino Agosto Jr., Abraham, Watkins, Nichols, Sorrels, Matthews & Friend, Clyde James Jackson III, Johnny N. Garza Jr., Houston, Vincent L. Marable, III, Paul Webb, P.C., Wharton, for Appellees.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION

LAURA CARTER HIGLEY, Justice.

This wrongful death and survival action arises from the on-the-job death of Oscar Alfredo Gomez. Following a jury trial, the trial court rendered judgment for

$1,408,491 in favor of Gomez's common-law wife, Elida Griselda Martinez, and Gomez's father, Carlos Gomez Portillo, against appellants, Republic Waste Services, Ltd. and Marco Castaneda.

On appeal, appellants challenge the trial court's decision to exclude evidence concerning Gomez's illegal immigrant status. Appellants assert that the evidence was relevant to the issue of damages, specifically appellees' request to recover Gomez's future lost earnings. Because we conclude that, under the circumstances of this case, the trial court reasonably exercised its discretion to exclude the evidence, we affirm the judgment of the trial court.

### Factual & Procedural Background

Oscar Alfredo Gomez and his common-law wife, Elida Griselda Martinez, immigrated to Houston from El Salvador. Gomez did not have a passport or a work visa. He used the social security number and "green card" of another individual to obtain a job with Republic Waste Services, Ltd., a garbage collection business. Republic hired Gomez to be a helper on one of its garbage trucks.

On the day of his death, Gomez was working on a garbage truck driven by Republic employee Marco Castaneda. As the garbage crew finished their last job, Castaneda backed the truck down a street and ran over Gomez. Gomez died of his injuries. Only then did Republic learn that Gomez had falsified immigration documents to gain employment with the company.

As Gomez's surviving spouse, Martinez filed a wrongful death suit alleging negligence against Castaneda and Republic, a non-subscriber to the Texas Worker's Compensation Act. Martinez filed suit individually, as representative of her husband's estate, and as next friend of their minor child, Amalia Griselda Gomez. Go-mez's father, Carlos Gomez Portillo, also filed suit against Republic and Castaneda.

Before trial, Martinez and Portillo (hereinafter "appellees") filed a motion in limine. Among the in limine requests, appellees asked the trial court to prohibit appellants from mentioning any evidence concerning Gomez's illegal immigrant status until the court ruled on the admissibility of the evidence outside the presence of the jury.

At the in limine hearing, appellees asserted that evidence regarding Gomez's illegal status was not relevant and was highly prejudicial. Appellants disagreed, asserting that evidence regarding Gomez's illegal status was relevant to the issue of Gomez's future lost income, which was an element of the pecuniary damages appellees sought to recover.

Appellants told the trial court that they planned to introduce evidence showing that federal immigration authorities had raided Republic's facilities two weeks after Gomez's death. That day, the authorities had arrested and removed a number of Republic employees, who were undocumented workers. Appellants told the court that a number of the workers never returned to Republic. Appellants argued that Gomez certainly would have been removed that day because he had fake employment documents.

Appellants also told the trial court that appellees planned to show that 21–year–old Gomez had earned $33,000 per year working for Republic. Appellants anticipated that appellees' evidence would show that, had he lived, Gomez would have worked another 35 to 40 years in the United States earning $33,000 per year. Appellants maintained that their evidence regarding Gomez's illegal status would demonstrate that Gomez was subject to immediate deportation, and that, in all

likelihood he would have been deported following the federal raid at Republic. Appellants argued that such evidence was relevant to counter appellees' damages model for lost future income. In short, appellants indicated that the evidence was probative of whether Gomez's future income would be earned in the United States or in his native El Salvador, where he had earned only $1,000 per year. Appellants argued that the jury should be allowed to weigh and consider the evidence, specifically the likelihood that Gomez would have been deported, in determining lost future income damages.

Appellees responded that the immigration evidence was irrelevant and overly prejudicial. They asserted that the evidence did not prove that Gomez was likely to be deported or that Gomez would not have continued to work in the United States. Appellees argued that the immigration evidence was too speculative and conjectural to be of probative value when weighed against the risk of prejudice inherent in telling the jury that Gomez was an illegal immigrant. The trial court agreed with appellees noting that it was "gross speculation" whether Gomez would have been deported. After much debate and consideration, the trial court agreed with appellees and granted the in limine request regarding the immigration evidence.

At trial, Martinez testified that she and Gomez came to Houston to start a new life. Martinez testified that she was six months pregnant with her daughter, Amalia, when Gomez was killed. She told the jury that Gomez was very excited about the baby. Her testimony indicated that they were happy and hoped to stay in the United States.

Gomez's father also testified at trial. He told the jury that his son had worked with him in El Salvador on a dairy farm making $15 to $20 per week or approximately $1,000 per year. After moving to the United States, Gomez sent his father $100 per month.

Appellees' economist, Dr. Kenneth McCoin, estimated that, had he lived, Gomez would have earned $33,000 per year for the next 36 years working in the United States. Dr. McCoin calculated appellees' total loss of future support to be $1,196,621. On cross-examination, Dr. McCoin testified that had Gomez worked the next 36 years in El Salvador, earning $1,000 per year, Gomez's future economic losses would have been roughly $28,800.

Appellants made bills of exception detailing the evidence that they were prepared to offer regarding Gomez's illegal immigrant status. Outside the presence of the jury, appellants elicited testimony from Martinez, Dr. McCoin, and Scott Bradshaw, who is Republic's general manager.

Bradshaw testified during the bill of exception that Gomez had used fake documents to obtain employment with Republic. The company did not discover the deception until after Gomez's death. In her bill-of-exception testimony, Martinez confirmed that Gomez had used another individual's social security card and green card to obtain employment with Republic.

As part of the bill of exception, Bradshaw also testified that two weeks after Gomez's death, officials from the United States Immigration and Customs Enforcement (ICE) held a surprise raid at Republic's Houston facility. The raid occurred at the beginning of a shift. According to Bradshaw, "They detained everyone at the building and those [sic] as they entered the property." He continued, "They looked at [the employees'] paperwork; and those that had a mismatch, they detained and hauled off the property."

Bradshaw testified that 50 to 55 of Republic's employees were detained and taken from the facility during the ICE raid. Approximately 30 of those detained never returned to Republic. At the time of trial, nearly two years later, there was still a van parked in Republic's parking lot that belonged to one of the detained workers.

Appellees' expert economist, Dr. McCoin, testified in the bill of exception that he had not factored in Gomez's illegal immigrant status when calculating future lost income. Dr. McCoin agreed that Gomez's "work-life statistic" would be affected by his illegal immigrant status because there was an increased risk that he would be "ejected from the workforce." Dr. McCoin stated that he did not know what the risk of deportation was for Gomez. Dr. McCoin then testified that there are, however, "two sides to it."

Dr. McCoin explained that an illegal immigrant has a strong motivation to remain in the United States because he often has few alternatives in his native country. Dr. McCoin testified that illegal immigrants are willing to work longer hours for less pay than legal workers. These factors operate to offset the effect of the risk of deportation, although he did not know how much.

Appellants' counsel asked, "If [Gomez] is deported, it certainly affects the assumption that you made that he would have continued to work at the 33,000–some-odd–dollar level that you assumed, doesn't it?" Dr. McCoin responded, "Well, no. Because, again, he comes back across [the border]. They can deport him. They can deport him a jillion times, and he comes

right back over." Dr. McCoin continued, "That's been known to happen and does happen all the time. But we're not tethering him to this company, but we are tethering him to that wage."

When appellants' counsel asked whether Dr. McCoin's assumption that Gomez would earn $33,000 for 37 years factored in the chance that Gomez might be deported, Dr. McCoin answered affirmatively. Dr. McCoin explained that, although Gomez's chance of deportation reduced his "work probability," the reduced work probability was offset by Gomez's strong desire to work. Dr. McCoin explained that he did not know what Gomez's work probability would be when these factors are also considered.

After each of the three witnesses testified during the bill of exception, appellees objected that the evidence was irrelevant, "highly prejudicial," and speculative. The trial court sustained appellees' objections. As a result, the jury did not hear appellants' evidence concerning Gomez's illegal immigrant status.

The jury found that appellants' negligence caused Gomez's death and awarded $1,408,491 to appellees. This included $1,275,000 for future pecuniary losses.[1]

The trial court rendered judgment on the jury's verdict. This appeal followed.

**Evidence Concerning Gomez's Illegal Immigrant Status**

In one issue, appellants contend that the trial court erred in excluding their evidence regarding Gomez's illegal immigrant status.[2]

---

1. In the jury charge, "pecuniary loss" was defined as "the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that [the plaintiff]

in reasonable probability would have received from Oscar Gomez had he lived."

2. Appellants emphasize that their complaint is *not* that appellees are precluded from recovering damages for Gomez's lost future in-

## A. Standard and Scope of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 906 (Tex.2000). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *See Cire v. Cummings,* 134 S.W.3d 835, 838–39 (Tex.2004).

We must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *See Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998). We cannot conclude a trial court abused its discretion merely because we would have ruled differently in the same circumstances. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995).

With these principles in mind, we determine whether appellants have shown that the trial court abused its discretion when it excluded the evidence presented by appellants in their bill of exception concerning Gomez's illegal immigrant status.

## B. Analysis

### 1. Relevance

■ Appellants focus primarily on the relevance of the disputed evidence. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX.R. EVID. 401. The test for relevancy is satisfied if there is directly, or by inference, some logical conclusion between the fact offered and the fact to be proven. *Boswell v. Brazos Elec. Power Co-op.,* 910 S.W.2d 593, 601 n. 3 (Tex.App.-Fort Worth 1995, writ denied).

Appellants argue that the trial court abused its discretion in excluding the evidence concerning Gomez's illegal status because the evidence is relevant to the jury's proper determination of future lost income. They assert that the evidence was needed to counter appellees' request for lost future wages based on Gomez's past earnings in the United States. Appellants contend that evidence indicating that Gomez was subject to immediate deportation was relevant to show that Gomez's employment in the United States would likely have been less than the 36 years claimed by appellees. Rather, based on his undocumented immigration status, Gomez likely would have returned to El Salvador either voluntarily or involuntarily for all or part of the 36 years. In short, appellants assert that the disputed evidence is relevant to the jury's determination of whether Gomez would have spent

come because of his illegal immigration status. A number of courts have determined that an undocumented worker is entitled to recover damages for lost future wages in a common-law personal injury action. *See, e.g., Tyson Foods, Inc. v. Guzman,* 116 S.W.3d 233, 244 (Tex.App.-Tyler 2003, no pet.) (rejecting defendant's claim that undocumented immigrant worker should be precluded from recovering damages for lost future earning capacity); *Wal–Mart Stores, Inc. v. Cordova,* 856 S.W.2d 768, 770 n. 1 (Tex.App.-El Paso 1993, writ denied) ("The current state of Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering damages for loss of earning capacity, nor will this Court espouse such a theory."); *see also Balbuena v. IDR Realty, LLC,* 6 N.Y.3d 338, 357, 845 N.E.2d 1246, 1256, 812 N.Y.S.2d 416, 426 (2006); *Rosa v. Partners in Progress, Inc.,* 152 N.H. 6, 14, 868 A.2d 994, 1001(2005); *but see Veliz v. Rental Serv. Corp. USA, Inc.,* 313 F.Supp.2d 1317, 1337 (M.D.Fla.2003) (concluding that policy underlying federal immigration law precludes recovery of projected future U.S. wages in a tort action).

his remaining working lifetime in the United States or in his native country of El Salvador. This determination correlates directly with the amount of future lost wages Gomez would have earned but for his death.

◼ In determining the relevancy of the disputed evidence, it is helpful to understand the nature of pecuniary loss damages. In this case, pecuniary damages appear to be comprised largely of the loss of monetary support that appellees would have received from Gomez had he lived. Generally, determination of pecuniary loss damages is a nebulous and somewhat imprecise process. See Thomas v. Uzoka, 290 S.W.3d 437, 454 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). The amount of income that may be earned in the future by a plaintiff or, as in this case, by a decedent is always uncertain, and must be left largely to the judgment and discretion of the jury. See McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 711 (1943).

◼ Future, unrealized events may be relevant to a jury's determination of a decedent's lost future income. For example, courts have admitted evidence in wrongful death actions to show that the deceased intended to change occupations or may have been promoted in the future. See, e.g., Douglass v. Delta Air Lines, Inc., 897 F.2d 1336, 1343 (5th Cir.1990) (concluding that trial court properly included decedent's likely career advancement within the calculus to determine lost earnings); Borak v. Bridge, 524 S.W.2d 773, 776–77 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.) (concluding that evidence that deceased student would pursue banking career is admissible); Bell Aerospace Corp. v. Anderson, 478 S.W.2d 191, 200 (Tex.Civ.App.-El Paso 1972, writ ref'd n.r.e.) (deciding that future earning potential of deceased Army major with projected advancement through officer ranks is admissible).

Neither the parties' nor our own research reveals any published Texas opinion in which a court determined whether evidence of a plaintiff's illegal immigrant status is relevant to the issue of future lost income. To support their relevancy argument, appellants rely on a 1972 unpublished opinion from San Antonio. The case is ABC Rendering of San Antonio, Inc. v. Covarrubias, No. 15085, 1972 WL 268822, 1972 Tex.App. Lexis 2794 (Tex.Civ. App.1972, no writ) (not designated for publication).

In Covarrubias, the plaintiff sought damages for the loss of past and future earning capacity. Id. at *1–2, 1972 Tex. App. Lexis 2794 at *4. The defendant challenged the trial court's exclusion of evidence showing that the plaintiff had entered the United States illegally. Id. at *6, 1972 Tex.App. Lexis 2794 at *16. Plaintiff's expert testified to the value of the plaintiff's lost earnings based on what the plaintiff would have earned in the United States over his life expectancy. Id. at *6, 1972 Tex.App. Lexis 2794 at *17. To rebut the plaintiff's expert, the defense offered evidence that the plaintiff had entered the United States illegally. Id. at *6, 1972 Tex.App. Lexis 2794 at *16. The trial court excluded the immigration evidence, and the defendant appealed. Id. The San Antonio Court of Appeals reversed and remanded the case for a new trial. Id. at *6, 1972 Tex.App. Lexis 2794 at *17. In support of its holding, the Covarrubias court reasoned, "The fact that plaintiff was subject to immediate deportation to a drastically lower standard of earnings would have an effect on his future earning capacity." Id. The court held that if evidence exists "as to the anticipated future earnings of a laborer in the United States, the jury should be permitted to

consider the effect of the plaintiff's illegal entry upon [these] future earnings." *Id.*

■ We agree with *Covarrubias* that immigration status can be a relevant consideration. *See id.; see also Salas v. Hi-Tech Erectors,* 168 Wash.2d 664, 670, 230 P.3d 583, 585–86 (2010); *Rosa v. Partners in Progress, Inc.,* 152 N.H. 6, 15, 868 A.2d 994, 1002 (2005) (concluding that "an illegal alien's status, though irrelevant to the issue of liability ... is relevant on the issue of lost earnings"); *Melendres v. Soales,* 105 Mich.App. 73, 78, 306 N.W.2d 399, 402 (1981) (explaining that "plaintiff's status as an illegal alien was clearly irrelevant on the question of liability, [but] it was material and relevant to the issue of damages, specifically the present value of future lost earnings"); *but see Clemente v. California,* 40 Cal.3d 202, 221, 707 P.2d 818, 829, 219 Cal.Rptr. 445, 456–57, (1985) ("[T]here was no evidence that [the plaintiff] had any intention of leaving this country and the speculation that he might at some point be deported was so remote as to make the issue of citizenship irrelevant to the damages question."). We conclude that appellants' evidence of Gomez's illegal status is relevant because it has a tendency to make the existence of the fact that Gomez would have continued to earn $33,000 per year in the United States for the remainder of his working lifetime less probable and to make the fact that he would have earned his wages in El Salvador more probable. *See* TEX.R. EVID. 401.

## 2. Balancing Probative Value against Prejudicial Effect

■ Although relevant, a trial court may exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* TEX.R. EVID. 403; *Mayhew v. Dealey,* 143 S.W.3d 356, 370 (Tex.App.-Dallas 2004, pet. denied) (explaining that, in making Rule 403 determination, trial court balances probative value of evidence against its potential for unfair prejudice or confusion). As mentioned, appellees objected at trial to the evidence of Gomez's illegal status on the basis that it was highly prejudicial, citing Rule of Evidence 403. Appellants have not shown that the trial court abused its discretion by excluding the subject evidence based on Rule 403.[3]

In *TXI Transportation Co. v. Hughes,* the Supreme Court of Texas determined that admitting evidence of a defendant's illegal immigrant status for purposes of impeachment and to aid in the plaintiff's establishment of negligent hiring and negligent entrustment was harmful error requiring reversal and retrial. 306 S.W.3d 230, 243–44 (Tex.2010). As part of its analysis, the court wrote, "Even assuming the immigration evidence had some relevance, its prejudicial potential substantially outweighed any probative value." *Id.* at 244. The court noted, "Even in instances where immigration may have limited probative value as to credibility, courts have held that such evidence is properly excluded for undue prejudice." *Id.* As examples, the *Hughes* court chose several opinions in which courts held that any probative value that evidence of illegal immigrant status

---

**3.** Appellants assert that the judgment cannot be affirmed on Rule 403 grounds because the trial court granted appellees' in limine request based relevancy grounds. Because the law is clear, we disagree. Following the presentation of evidence in each bill of exception, appellees asserted a Rule 401 relevancy objection and a Rule 403 prejudice objection. We

must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *See Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998). If it was within the trial court's discretion to exclude the evidence based on Rule 403 grounds, then we must affirm the judgment. *See id.*

may have with respect to the issue of future income damages is outweighed by the prejudicial effect of the immigration evidence. *See id.* at n. 8 (citing, inter alia, *Clemente v. State,* 40 Cal.3d 202, 707 P.2d 818, 829, 219 Cal.Rptr. 445 (1985) (holding illegal immigrant status, "even if marginally relevant [on damages issues], was highly prejudicial"); *Klapa v. O & Y Liberty Plaza Co.,* 168 Misc.2d 911, 913, 645 N.Y.S.2d 281, 282 (N.Y.Sup.Ct.1996) (precluding "evidence which would indicate a plaintiff's immigration status," because "whatever probative value illegal alien evidence may have [as to damage calculations] is far outweighed by its prejudicial impact"); *Gonzalez v. City of Franklin,* 137 Wis.2d 109, 139–40, 403 N.W.2d 747, 759–60 (1987) (affirming exclusion of illegal alien status, which had only "speculative or conjectural" relevance to damage issues but carried "obvious prejudicial effect")).

Other courts have also held that evidence of a plaintiff's illegal immigrant status should be excluded based on its unfairly prejudicial effect when future lost earnings are at issue. *See, e.g., Salas,* 168 Wash.2d at 672, 230 P.3d at 587 (holding, "we are convinced that the probative value of a plaintiff's undocumented status, by itself, is substantially outweighed by the danger of unfair prejudice"); *Peterson v. Neme,* 222 Va. 477, 483, 281 S.E.2d 869, 872 (1981) (affirming trial court's decision to exclude evidence of plaintiff's illegal immigrant status offered to rebut future lose wage claim, noting that such evidence is "uniquely prejudicial" and that "the trial court properly could conclude that the prejudicial impact of the proffered evidence outweighed its probative value"); *but see Rosa,* 152 N.H. at 15, 868 A.2d at 1002 (concluding that, although evidence of illegal immigrant status is prejudicial, such evidence is essential to claim for lost earning capacity measured at United States wage rates).

Although the fact finder has discretion when determining an award of future income, *see McIver,* 169 S.W.2d at 711, that discretion is limited and must have evidentiary support. *Thomas,* 290 S.W.3d at 454; *see Saenz v. Fid. & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996) (explaining that "[j]uries cannot simply pick a number and put it in the blank"). Courts have cautioned that pecuniary loss damages should not be influenced by passion or prejudice. *See Samco Properties, Inc. v. Cheatham,* 977 S.W.2d 469, 480 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) (citing *Louisiana & A. Ry. Co. v. Chapin,* 225 S.W.2d 614, 616 (Tex.Civ. App.-Texarkana 1949, writ ref'd)).

Undeniably, the issue of immigration is a highly charged area of political debate. As a result, a trial court is prudent to weigh carefully evidence revealing a plaintiff's illegal immigrant status against the probative value of such evidence. The probative value of evidence showing only that the plaintiff is an illegal immigrant, who could possibly be deported, is slight because of the highly speculative nature of such evidence. *See id.* Without a showing that a plaintiff will likely be deported in his working lifetime, the jury is invited to engage in conjecture and speculation regarding whether he will be deported, when he will be deported, and, if deported, whether he will return to the United States to work. As a result, the probative value of evidence concerning a plaintiff's illegal immigrant status is low, while the prejudicial effect of this evidence is high. *See id.* Appellants contend that their bill of exception contained evidence showing more than a possibility that Gomez would have been deported; that is, they assert that they offered evidence beyond Gomez's simple status as an illegal immigrant. In this regard, appellants point to Bradshaw's testimony in their bill of exception in which

Bradshaw described the federal immigration ICE raid conducted two weeks after Gomez's death. Appellants assert that this testimony was evidence from which the jury could have reasonably inferred that Gomez would have been deported in the near future.

While we are sensitive to a defendant's need to rebut a plaintiff's damages evidence, a defendant must do so with competent evidence, not with speculative evidence. Bradshaw's testimony regarding the immigration raid comes no closer to establishing that Gomez would likely have been deported than his illegal immigrant status alone. The information necessary for the jury to reach such a finding is lacking from Bradshaw's testimony. Bradshaw's testimony that 50 to 55 employees were detained by federal authorities, due to "mismatched" paperwork, offers little to guide the jury to find that, had he lived, Gomez also would have been detained.

Bradshaw's testimony that approximately 30 of the 50 to 55 detained employees never returned to Republic, including one employee who abandoned his van there, does not, without engaging in speculation and conjecture, rise to the conclusion that Gomez would have been deported, even if he had been detained.

The probative value of Bradshaw's bill of exception testimony was slight because of its speculative nature. At the same time, the prejudicial effect of the evidence was great. As a result, the trial court could have properly concluded that Bradshaw's bill of exception testimony did not survive the balancing test under Rule 403.

We note that the scale may have tipped in favor of appellants with respect to the Rule 403 balancing test had certain evidence, aside from the illegal status evidence, been presented at trial. For instance, had evidence been presented at trial showing that Gomez was the subject of a deportation proceeding or had been detected by federal immigration authorities, the probative value of the illegal status evidence may have outweighed its prejudicial effect.

In addition, appellees did not claim or offer evidence that Gomez's wages would have escalated or that he would have received a promotion in his employment had he lived. Rather, appellees' damages calculations were based on Gomez's past income stream, i.e., the amount he was earning at the time he was killed on the job. Again, the evidentiary ruling in this case may have been different had such evidence or arguments been advanced by appellees. However, that is not the record before us.

Importantly, the jury had before it ample evidence regarding Gomez's immigration status. This evidence served to lessen the probative value of appellants' evidence regarding Gomez's illegal status.

The jury heard that 21–year–old Gomez and his wife had recently emigrated from El Salvador. The evidence showed that Gomez and his wife had immediate family, including Gomez's father, who still lived in El Salvador. From such evidence, the jury could have deduced that Gomez may have returned to El Salvador had he lived. The jury also heard that Gomez had earned $1,000 per year working in El Salvador. McCoin testified that Gomez would have earned $28,800 if he had returned to El Salvador to work the remainder of his working lifetime. The jury was free to factor this evidence into its damages calculation.

Lastly, we note that the trial court's decision to exclude the evidence regarding Gomez's illegal immigrant status is in line with principles espoused elsewhere in Texas law. For example, Texas courts have rejected a defendant's claim that an undoc-

umented worker should be precluded from recovering damages for lost future earning capacity because of his illegal status. *See, e.g., Tyson Foods, Inc. v. Guzman,* 116 S.W.3d 233, 244 (Tex.App.-Tyler 2003, no pet.); *Wal–Mart Stores, Inc. v. Cordova,* 856 S.W.2d 768, 770 n. 1 (Tex.App.-El Paso 1993, writ denied). In addition, section 406.092(a) of the Texas Labor Code provides that a resident or nonresident alien employee is entitled to compensation under the Workers Compensation Act. TEX. LAB.CODE ANN. § 406.092(a) (Vernon 2006). In other words, illegal workers are treated the same as legal workers for purposes of asserting a workers' compensation claim in Texas. *See id.*

To summarize, the evidence concerning Gomez's illegal status is of some relevance to the determination of Gomez's lost future income. However, the probative value of the ICE raid, as well Gomez's illegal immigrant status, was slight given the speculative nature of the evidence sought to be admitted and the ample evidence that was admitted about Gomez's immigration status. Simply put, the usefulness of the evidence was limited given what other evidence was, and was not, admitted in this case.

Had the illegal immigrant status evidence been admitted, the jury would have been required to essentially guess whether Gomez would ever have been deported. Simultaneously, the prejudicial effect of revealing that Gomez was an illegal immigrant would be great and outweighs the probative value of the evidence. In short, the record supports the trial court's determination that the illegal status evidence was inadmissible under Rule 403.[4]

In the end, we come back to the principle that the decision to admit or to exclude evidence is committed to the trial court's sound discretion. The trial court is left to exercise that discretion by applying the law to the evidence presented in each case before it. Although the rules of evidence always govern, the evidentiary decisions made after applying those rules will vary from case to case.

Absent a showing on appeal that the trial court acted without reference to any guiding rules and principles, or acted arbitrarily and unreasonably, we must uphold a trial court's decision to admit or to exclude evidence. Here, appellants have made no such showing. Thus, we conclude that, under the circumstances of this case, it was within the trial court's discretion to exclude the evidence concerning Gomez's illegal immigrant status.

We overrule appellants' sole issue.

### Conclusion

We affirm the judgment of the trial court.

---

4. We note that in *Covarrubias,* authority relied on by appellants, the court did not conduct a Rule 403 analysis; that is, it did not determine whether the probative value of the illegal status evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See ABC Rendering of San Antonio, Inc. v. Covarrubias,* No. 15085, 1972 WL 268822, at *6, 1972 Tex.App. Lexis 2794, at *17 (Tex. Civ.App.1972, no writ) (not designated for publication).