

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-22-00072-CV

**JMI CONTRACTORS, LLC**,
Appellant

v.

Jose Manuel **MEDELLIN**,
Appellee

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-CI-05983
Honorable Aaron Haas, Judge Presiding

**OPINION ON MOTION FOR REHEARING**

Opinion by:    Luz Elena D. Chapa, Justice
Dissenting Opinion by: Rebeca C. Martinez, Chief Justice

Sitting:       Rebeca C. Martinez, Chief Justice
               Luz Elena D. Chapa, Justice
               Liza A. Rodriguez, Justice

Delivered and Filed: August 28, 2024

AFFIRMED

This is a personal injury case brought by appellee Jose Manuel Medellin against appellant

JMI Contractors, LLC for injuries he sustained after falling off a roof at a construction site.

Medellin sued JMI for negligence, gross negligence, and premises liability, and the jury awarded

him $4,637,375.72.  On appeal, JMI argues: 1) the evidence is legally and factually insufficient to

support Medellin's claims and the damages awarded, 2) the trial court abused its discretion by

excluding certain evidence, and 3) Medellin's counsel engaged in an incurable jury argument.

In our opinion dated June 28, 2023, we held the trial court erred by "excluding evidence that Medellin consumed alcohol and marijuana on the day of the incident," and the exclusion "probably caused the rendition of an improper judgment." We therefore reversed and remanded the case for a new trial. Medellin timely filed a motion for rehearing, and we requested a response from JMI. After considering the motion and response filed, we grant Medellin's motion for rehearing, withdraw our prior opinion and judgment, and substitute this opinion and judgment in their stead.

## BACKGROUND

JMI is a restoration and renovation company that provides exterior repair services to multi-family housing developments, such as apartment complexes, townhomes, and condominiums. In June 2017, the Oaks on Bandera Apartments (the Oaks Apartments) hired JMI to repair the roofs of the buildings making up its apartment complex; the roofs had been damaged by hail. JMI's project superintendent John Obiedo and safety advisor Carlos Angelini worked on the project and were responsible for ensuring proper safety rules and regulations were enforced. Raul Rodriguez, a roofing supervisor for JMI, also worked on the project and was responsible for making sure the "workers" used fall protection. Photographs of the Oaks Apartments show the buildings have a flat-roof design, and according to Obiedo, flat-roof safety standards required setting up a warning line along the roof perimeter to warn workers when they were approaching the edge.

Roofing work at the Oaks Apartments started on March 1, 2018, and workers began preparing to re-roof the buildings with thermoplastic polyolefin ("TPO") material, a single-ply rubberized roofing membrane. Photographs taken of the construction site and daily field reports completed by JMI show workers were sweeping gravel on the roofs and laying TPO material without any safety precautions in place. On March 9, 2018, Rodriguez contacted Abelardo Hernandez of Metal Roof & TPO Specialist, LLC (Metal Roof) to help with the project. By this

time, workers had re-roofed one building, and JMI planned for Hernandez to utilize a different technique on another building as a "job sample." It was Hernandez's understanding if JMI and the Oaks Apartments liked the sample, he would be awarded the roofing contract for the remainder of the buildings.

The next morning, Hernandez called Medellin, who he had worked with in the past, to help with the project. Medellin agreed, and when he arrived at the apartment complex, Hernandez, Obiedo, Rodriguez, and Rodriguez's assistant Reybel Rodriguez were on site. Medellin observed a twelve-by-twelve-foot area had been marked in the middle of the building as the "sample patch," and no warning line had been installed on the roof. Medellin worked alongside Reybel, walking backward, rolling the material from edge to edge, and then stretching and flattening the material out to make a waterproof seal. According to Medellin, as he walked backward, he would stop and turn to see where the roof's edge was located. When he was approximately seven feet from the edge, he was instructed to "pull the whole roll." At one point, as he unrolled the material, he fell off the side of the two-story building, sustaining numerous injuries.

Medellin sued JMI, alleging negligence, gross negligence, and premises liability.[1] Among other things, Medellin alleged JMI owed him a duty because it exercised control over the safety of the premises, and it failed to adequately warn Medellin of the dangers of the premises. The jury found in favor of Medellin; it specifically found JMI exercised control over the use of fall protection safety measures for the roofing work performed at the Oaks Apartments and found it was negligent under Medellin's negligent activity and premises liability theories of recovery; it further found Angelini grossly negligent. It awarded Medellin damages for past and future pain and suffering, past and future mental anguish, past and future loss of earning capacity, past and

---

[1] Medellin also filed suit against Metal Roof, but ultimately nonsuited his claims against Metal Roof.

future physical impairment, past and future mental expenses, and exemplary damages. The trial court entered a final judgment in favor of Medellin for $4,637,375.72, and JMI filed this appeal.

LEGAL AND FACTUAL SUFFICIENCY CHALLENGES TO MEDELLIN'S LIABILITY CLAIMS

According to JMI, the evidence is legally and factually insufficient to support the jury's verdict that found it negligent under Medellin's negligent activity and premises liability claims. Interwoven in its sufficiency challenge, JMI contends it owed no duty to Medellin under a negligent activity theory because Medellin was hired as an independent contractor by an independent contractor, and there is no evidence it exercised control over Medellin. As to Medellin's premises liability claim, JMI further argues it had no duty to warn Medellin of an open and obvious danger, and the necessary-use exception does not apply. JMI also contends even assuming it owed Medellin a duty, the evidence is legally and factually insufficient to show it breached any duty. Finally, JMI asserts the evidence is legally and factually insufficient to show Angelini acted with gross negligence.

### A. Sufficiency Standards of Review

The standards for legal and factual sufficiency are well-established. Under a legal sufficiency standard:

> [W]e consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review. Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. The record contains more than a mere scintilla of evidence when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. Conversely, the record contains less than a scintilla when the evidence offered to prove a vital fact's existence is "so weak as to do no more than create a mere surmise or suspicion." All the record evidence must be considered "in the light most favorable to the party in whose favor the verdict has been rendered," and "every reasonable inference deducible from the evidence is to be indulged in that party's favor."

*Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017); and then *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)) (citations omitted).  Under a factual sufficiency standard:

> When reviewing an assertion that the evidence is factually insufficient to support a finding, a court of appeals sets aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, it determines that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.

*Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

## B.  Negligent Activity Claim and Duty

"The existence of a legal duty is a question of law for the court to decide . . . from the facts surrounding the occurrence in question.'" *Tri v. J.T.T.*, 162 S.W.3d 552, 563 (Tex. 2005) (quoting *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994)).  In general, "one who employs an independent contractor has no duty to ensure that the contractor safely performs its work." *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 865 (Tex. 2021) (citing *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020)).  An exception to this general rule exists when "the employer retains some control over the manner in which the contractor performs the work that causes the damage." *Id.* (quoting *AEP*, 612 S.W.3d at 295) (internal quotation marks omitted).  "A plaintiff can prove the requisite control by establishing that the general contractor either actually controlled the manner in which the subcontractor performed its work or had a contractual right to do so." *Id.* The "control must relate to the condition or activity that caused the injury" and must "extend[] to the means, methods, or details of the independent contractor's work such that the contractor is not entirely free to do the work in his own way." *AEP*, 612 S.W.3d at 295 (quoting *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); and then *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999)) (internal quotation marks omitted).

At trial, the jury heard testimony from Obiedo, Angelini, and Rodriguez, who each testified they were responsible for ensuring all workers used fall protection while performing work for JMI, and certain fall protection was required for this roofing project. Rodriguez further testified that as a JMI roofing supervisor, he was responsible for hiring independent contract workers for roofing projects and making sure their contracted workers followed JMI's safety rules. His responsibility included contacting Hernandez of Metal Roof about working on this project. Rodriguez explained when he hired contract workers in the past, JMI had provided them with equipment and materials to complete the work.

Turning to the day of the incident, Obiedo, Angelini, and Rodriguez each testified they had visited the site on the morning of the accident, and they were aware a warning line was not in place. Specifically, Rodriguez and Obiedo testified a warning line was not used that day because Hernandez's work crew was only going to install a sample in the middle of the roof's building. Rodriguez explained a heat gun would be used to apply the sample, and he brought the heat gun and other equipment for the crew to use. According to Rodriguez, by the time Hernandez had arrived, the area for the sample patch had been marked and the roll of TPO material had been set on top of the roof.

Rodriguez testified he and Hernandez were working on the sample patch when Medellin arrived. Rodriguez stated Medellin climbed on the roof without wearing a harness, and Rodriguez told everyone, including Medellin, what they needed to do and how to do it. Rodriguez testified he never instructed Medellin to wear a harness, although he and Hernandez were wearing harnesses. According to Rodriguez, he believed Medellin was safe because they were working in the middle of the building. An "Incident Analysis Form" completed by Angelini, witnessed by Rodriguez, and signed by Hernandez also revealed a watchman designated by JMI was on duty to serve as fall protection.

Under the appropriate standards of review, we conclude such evidence is sufficient to establish JMI actually controlled the safety requirements and manner of Medellin's work on the jobsite and therefore owed Medellin a duty of care. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001) (holding testimony showing construction company's job superintendent was responsible for inspecting whether employees properly utilized fall protection equipment was legally sufficient evidence construction company retained the right of actual control and thus owed duty to plaintiff). Here, there was testimony JMI provided more than a mere presence at the job site; the testimony showed it was not only aware of the roofing project's fall protection requirements, but it was also responsible for ensuring all the workers followed JMI's safety requirements. *See JLB Builders*, 622 S.W.3d at 867 (recognizing "the mere presence of a general contractor's safety employee at the work site does not give rise to 'a duty to an independent contractor's employees to intervene and ensure that they safely perform their work'") (quoting *Chapa*, 11 S.W.3d at 157). The testimony further indicated JMI exercised actual control over the manner in which Medellin was expected to install the TPO material. This control extended to the nature of Medellin's work because Rodriguez instructed Medellin on what to do, and Medellin was not entirely free to carry out his work in his own way. *See id.* (explaining "an employer who gives on-site orders or provides detailed instructions on the means or methods to carry out a work order owes the independent contractor employee a duty of reasonable care to protect him from work-related hazards") (quoting *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998)) (internal quotation marks omitted). As a result, the record contains more than a mere scintilla of evidence for the jury to find JMI retained a right of control over Medellin's work, and such a finding was not so weak or contrary to the overall weight of all the evidence. *See Gunn*, 554 S.W.3d at 658; *Gardiner*, 505 S.W.3d at 615. Accordingly, because we conclude the evidence is legally and factually sufficient to support the jury's determination that JMI retained a right of

actual control over Medellin's work, we hold JMI owed Medellin a duty to ensure he safely performed the work.

### C. Premises Liability and Duty

"Negligence and premises liability claims . . . are separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements to secure judgment in their favor." *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017). Pertinent to this case, "[n]egligent-activity and premises liability claims 'involve closely related but distinct duty analyses.'" *Id*. (quoting *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)). "Generally, an owner or occupier of property has a duty to keep the premises under its control in a safe condition." *Id*. at 473. And in cases involving a general contractor, the Texas Supreme Court has recognized a general contractor has the same duty as an owner or occupier of land when it assumes control of or retains the right to control the premises. *Id*. at 474.

The duty owed to the plaintiff typically depends on the plaintiff's status at the time the incident occurred. *Id*. Here, the parties do not dispute Medellin's status as an invitee; therefore, JMI owed Medellin a duty "to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Id*. (quoting *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 203 (Tex. 2015)) (internal quotation marks omitted). However, under the open-and-obvious doctrine, "[a] dangerous condition that is undisputedly open and obvious . . . raises no obligation to warn as a matter of law." *SandRidge Energy, Inc. v. Barfield*, 642 S.W.3d 560, 563 (Tex. 2022); *see Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 788 (Tex. 2021) (applying open-and-obvious doctrine to premises liability claims). This is because "an invitee exercising ordinary care would have 'knowledge and full appreciation of the nature and extent of the danger.'" *SandRidge Energy*, 642 S.W.3d at 563 (quoting *Austin*, 465 S.W.3d at 203). But under the necessary-use exception, a duty to make the

premises safe arises when "'despite [the invitee's] awareness of the risks, it is necessary that the invitee use the dangerous premises and the landowner should have anticipated that the invitee is unable to take measures to avoid the risk.'" *Id*. at 568 (alteration in original) (quoting *Austin*, 465 S.W.3d at 208). This is because "in some unreasonably dangerous situations, no warning can be adequate." *Id*.

Here, the premises liability question submitted to the jury incorporated the necessary-use exception. The instruction provided that JMI was negligent with respect to the premises if, among other elements, Medellin "necessarily had to use the premises" and JMI "should have anticipated" that Medellin was unable to avoid the risk. Based on this instruction, the jury ultimately found JMI negligent. JMI, however, contends the necessary-use exception does not apply because Medellin was an independent contractor of an independent contractor. According to JMI, the exception is a narrow one and applies only in a "lessor/lessee context;" it does not extend a duty to an employee or independent contractor because a worker can take reasonable measures to protect himself or choose not to perform unsafe aspects of the work.

Although we recognize the Texas Supreme Court "has expressed doubt that the necessary-use exception applies to independent contractors," it has not held as much. *Id.* (concluding it "need not resolve whether the necessary-use exception applies to contractors"). Instead, it has "observed that 'one who hires an independent contractor generally expects the contractor to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings.'" *Id.* (quoting *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 216 (Tex. 2008)). Further, the court held in the cases before it involving independent contractors, the exception was not met, and thus, did not apply. *Id.* at 569 (pointing out exception was not met when contractor had worked "for at least six months prior to his injury" and was aware of the risks of working with energized lines); *see also Moritz*, 257 S.W.3d at 218

(rejecting application of necessary-use exception because duties owed in that case were not same as duties owed to independent contractors working on premises).

"To invoke the exception, a plaintiff must show that the landowner [in this case, the general contractor as the occupier] would anticipate that the invitee is 'unable to take measures to avoid the risk.'" *SandRidge Energy*, 642 S.W.3d at 569 (quoting *Austin*, 465 S.W.3d at 203). Contrary to supreme court caselaw generally holding the exception may not apply in cases involving independent contractors, the evidence shows here that the exception has been squarely met. This is because the evidence shows JMI controlled the safety requirements of the jobsite and could not have expected Medellin to install a warning line to protect himself while working on the roof. It is undisputed Hernandez called Medellin on the day of the accident to work as a helper for approximately four hours to install a sample of TPO material. Although Hernandez had worked with Medellin on past projects, Medellin was not aware of the details of this specific roofing project. Medellin also testified he had not worked on a flat roof prior to the accident, and he was not familiar with installing TPO roofing material. When asked whether he had used fall protection prior to the day of the accident, Medellin testified he had used it when he had worked on pitched roofs that were "three floors" high. For this job, he brought only his toolbelt to the jobsite, and JMI provided the equipment and materials. Furthermore, the evidence shows when Medellin was installing the sample, neither he, nor Hernandez, had been fully hired by JMI as an independent contractor for the project; they were merely installing a sample in anticipation of being awarded a contract. Accordingly, such evidence establishes JMI should have anticipated Medellin, a helper who was performing a job sample, was unable to take the safety measures required to avoid the risk of falling off a flat roof. We therefore hold the necessary-use exception applies to these facts, and JMI owed a duty to warn Medellin of the dangers associated with the roofing project.

**D. Breach of Duty**

JMI next contends the evidence is legally and factually insufficient to show it breached any duty owed to Medellin. According to JMI, the only evidence Medellin produced to establish breach was an allegation it violated Occupational Safety and Health Administration (OSHA) safety regulations, but a mere violation is not negligence per se.

Both parties agree the violation of an OSHA standard does not establish negligence per se, but the standard is relevant in establishing "the cumulative wisdom of the industry on what is safe and what is unsafe." *Wal-Mart Stores, Inc. v. Seale*, 904 S.W.2d 718, 720 (Tex. App.—San Antonio 1995, no writ). Here, Medellin did not allege negligence per se, and the evidence indicating JMI was aware of the need for a warning line, but chose not to install it, was relevant in establishing the duty owed to Medellin and JMI's breach of that duty. And contrary to JMI's assertion that Medellin solely relied on the violation of OSHA standards establishing duty and breach, our analyses above detail the additional evidence produced at trial to establish duty and breach as to Medellin's negligent activity and premises liability claims.

**E. Gross Negligence**

Finally, JMI challenges the legal and factual sufficiency of the evidence supporting the jury's gross negligence finding. "Gross negligence consists of both objective and subjective elements." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). "'Gross negligence' is an act or omission": (1) "which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others;" and (2) "of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." TEX. CIV. PRAC. & REM. CODE § 41.001(11); *see Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008); *Harrison*, 70 S.W.3d at 785.

"Extreme risk" is not "a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." *Hogue*, 271 S.W.3d at 248. (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 21–22 (Tex. 1994)) (internal quotation marks omitted). "And the risk must be examined prospectively from the perspective of the actor, not in hindsight." *Id*.

Gross negligence must also be proven by clear and convincing evidence. *Id*. "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE § 41.001(2); *see Waldrip*, 380 S.W.3d at 137. A plaintiff cannot satisfy this heightened evidentiary burden or shift the burden to the defendant "by evidence of ordinary negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(b). Stated simply, "[s]ome evidence of simple negligence is not evidence of gross negligence," and "[c]onversely, some evidence of care does not defeat a gross-negligence finding." *Harrison*, 70 S.W.3d at 785.

Because of this heightened burden of proof, we apply the following heightened standards of review.

> A legal sufficiency review of a finding required to be based on clear and convincing evidence must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter required to be established by clear and convincing evidence. We consider all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. That is, if after conducting our legal sufficiency review of the record evidence, we determine that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient.

> In conducting a factual-sufficiency review of evidence to be proven by clear and convincing evidence, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. Our inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. Evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable fact finder could not have

credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction.

*Telesis/Parkwood Ret. I, Ltd. v. Anderson*, 462 S.W.3d 212, 245–46 (Tex. App.—El Paso 2015, no pet.) (internal quotation marks omitted).

In this case, Angelini testified he was the safety advisor for JMI and was responsible for ensuring OSHA regulations were complied with at JMI construction sites. He testified he would personally review the safety policies with subcontractors at the beginning of a job, and specifically, he would review fall protection requirements with roofing subcontractors. Angelini testified at each safety meeting, the subcontractor would sign a sheet verifying he was presented with the policies. When asked whether he had a preconstruction meeting with Hernandez, Angelini testified he had not, but Hernandez had signed the safety sheet acknowledging the policies. Angelini also testified he had reviewed safety guidelines in the past with Rodriguez, who Angelini knew was JMI's roofing consultant. According to Angelini, he had to correct Hernandez and Rodriguez in the past regarding safety regulations for other projects.

With respect to the safety regulations for flat roofs, Angelini testified OSHA standards required either a barrier installed along the edge or a watchman in place to warn workers if they were too close to the edge. When workers worked within six feet of the edge of a flat roof, they were required to wear a harness or use a lanyard. When asked about temporary jobs or "sample jobs," Angelini stated he did not inspect temporary job sites, and it was up to the subcontractor to implement fall protection safety measures. The evidence also shows Angelini was aware of the Oaks Apartments construction site and had visited the site the morning of the accident before Medellin had arrived.

When viewing this evidence objectively from Angelini's standpoint and in the light most favorable to the jury's finding, the jury could have formed a firm belief or conviction installing

the sample patch without using a warning line or ensuring the workers wore harnesses created an extreme risk of harm. *See Harrison*, 70 S.W.3d at 785–86 (holding testimony acknowledging working without independent lifeline on ninth and tenth floor of hospital presented a fall hazard was legally sufficient evidence to satisfy objective prong of gross negligence). The jury could have further formed a firm belief or conviction Angelini was grossly negligent from a subjective standpoint. Here, Angelini specifically testified he knew the Oaks Apartments had flat roofs, and he was aware of the risks associated with working on flat roofs. However, despite knowing they had violated safety regulations in the past on other projects, he did not have a preconstruction meeting with Hernandez and Rodriguez. Such evidence shows Angelini was subjectively aware of the extreme risk of serious injury to roofers, but he chose not to take any preventive action. *See id*. (holding evidence showing LLC knew workers were using ineffective fall-protection system, but did not remedy, constitutes legally sufficient evidence to satisfy subjective prong of gross negligence). Finally, when giving due consideration to all the evidence, including disputed evidence, the jury could have further resolved any disputed evidence in favor of its gross negligence finding. *See Anderson*, 462 S.W.3d at 245–46. Accordingly, we hold the evidence is legally and factually sufficient to support the jury's gross negligence finding.

**EXCLUSION OF EVIDENCE**

### A. Exclusion of Medellin's Testimony

JMI argues the trial court abused its discretion when it granted Medellin's request to exclude evidence showing he had consumed alcohol and used marijuana on the morning of the accident. JMI asserts the evidence was probative to show Medellin was contributorily negligent, and as a result, the exclusion altered the outcome of the case. Medellin, however, contends the trial court did not abuse its discretion because the excluded evidence was not relevant and, even if relevant, was unfairly prejudicial because it did not explain why Medellin fell. On rehearing,

Medellin further contends that even assuming the trial court abused its discretion by excluding the evidence, the trial court's error was harmless because cumulative evidence was introduced.

A trial court's evidentiary ruling is within its sound discretion. *Waldrip*, 380 S.W.3d at 132; *see, e.g.*, *JBS Carriers*, *Inc. v. Wash.*, 564 S.W.3d 830, 836 (Tex. 2018). "A trial court abuses this discretion when it acts without regard for guiding rules or principles." *Waldrip*, 380 S.W.3d at 132. However, even if the trial court's admission of evidence constitutes an abuse of discretion, we will reverse only if "the error was harmful, *i.e.*, it probably resulted in an improper judgment." *Id.*; *see JBS Carriers*, 564 S.W.3d at 836. "In determining if the excluded evidence probably resulted in the rendition of an improper judgment, a court must review the entire record." *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). Erroneously excluded evidence "crucial to a key issue" is likely harmful "unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *JBS Carriers*, 564 S.W.3d at 836.

Here, the complained of evidence concerns portions of various deposition testimony showing Medellin consumed a sixteen-ounce beer and smoked half a marijuana cigarette on the morning of the accident because he had not expected to work the remainder of that day. Specifically, in his deposition, Medellin testified when Hernandez called him about working at the Oaks Apartments, he thought he did not need to tell Hernandez he had drank a beer because he had "[j]ust one." Medellin further testified he had smoked a marijuana cigarette with his beer, and he had finished drinking the beer and smoking the cigarette by 10:30 a.m. His fall occurred at 3:00 p.m.

Even assuming the trial court erred by excluding this evidence, a review of the entire record shows the excluded evidence was cumulative of other evidence introduced at trial. *See JBS Carriers*, 380 S.W.3d at 132; *Able*, 35 S.W.3d at 617. Specifically, Medellin's medical records,

containing information taken after the incident, indicate Medellin had alcohol and marijuana in his system on the day of the accident; these records were admitted into evidence. Thus, to the extent JMI contends Medellin's alcohol and drug consumption was crucial to a key issue in the case, i.e. Medellin's contributory negligence, JMI does not meet its burden in establishing harmful error because this evidence was before the jury to consider. Merely showing the excluded evidence was crucial to a key issue is insufficient. *Gunn*, 554 S.W.3d at 668 ("Our guidelines make clear that even if the exclusion of evidence is crucial to a key issue, it is '*likely* harmful,' not conclusively or per se harmful.") (emphasis in original). Instead, to establish harmful error, JMI was required to "show that the exclusion of evidence probably resulted in rendition of an improper judgment," which is accomplished by reviewing the entire record. *Id*. at 669 ("Our standard does not require that a complaining party show that evidence was not cumulative, not so one-sided, or even crucial to a key issue."). Here, after reviewing the entire record and seeing the excluded evidence was cumulative of other evidence, we cannot say the exclusion probably caused the rendition of an improper judgment. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004) ("Clearly, erroneous admission is harmless if it is merely cumulative."). We therefore hold the exclusion was harmless.

The dissent opines Medellin's cumulative-evidence argument cannot be raised for the first time in a motion for rehearing, and Medellin failed to direct us to any cumulative evidence in his opening appellee's brief. However, the dissent misplaces the burden of establishing harmless error on Medellin. To obtain a reversal based on the erroneous admission of evidence, the appellant, not the appellee, must show the trial court's ruling was error and the error caused the rendition of an improper ruling. *See* TEX. R. APP. P. 44.1; *State v. Cent. Expressway Sign Assocs*., 302 S.W.3d 866, 870 (Tex. 2009); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992). On appeal, an appellee "d[oes] not need to raise every argument supporting the trial court's judgment in its appellee's

brief in the court of appeals." *In re G.X.H.*, 627 S.W.3d 288, 295 (Tex. 2021); *Trujillo v. Shafaii Invs., Ltd.*, No. 01-22-00819-CV, 2024 WL 2001612, at *10 (Tex. App.—Houston [1st Dist.] May 7, 2024, no pet.) ("But an appellee who prevails in the trial court does not need to raise arguments in support of the trial court's judgment in its appellate brief and does not waive an issue by failing to do so."). In fact, an appellee may present an argument for the first time in a motion for rehearing when, as in this case, the complaint arose from our original judgment reversing the trial court's judgment. *See G.X.H.*, 627 S.W.3d at 295.

The dissent further states the excluded evidence was not cumulative. Again, we disagree. As we explained above, the excluded evidence was cumulative of Medellin's medical records admitted at trial, which showed he had alcohol and marijuana in his system on the day of the accident. *JBS Carriers*, 564 S.W.3d at 840 ("Exclusion of evidence is likely harmless if the evidence was cumulative" of other evidence in the record.). As a result, the jury was free to consider any impact such substances may have had on Medellin when determining whether JMI was negligent. Thus, because such evidence was already before the jury in the form of medical records, we cannot conclude the exclusion of the deposition testimony led to the rendition of an improper judgment.

### B. Medellin's Immigration Status

JMI next contends the trial court abused its discretion by excluding any reference to "Medellin's immigration status and that he was in jail." According to JMI, the exclusion was improper because "evidence of a pending deportation directly impacts a party's future earnings claim."

Relevant evidence is generally admissible and refers to evidence having "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." TEX. R. EVID. 401. As pointed out by JMI,

"[i]mmigration status can be a relevant consideration" in determining a plaintiff's damages for the loss of future earning capacity. *See Republic Waste Servs., Ltd. v. Martinez*, 335 S.W.3d 401, 408 (Tex. App.—Houston [1st Dist.] 2011, no pet.). However, such evidence may be excluded under Texas Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id*. (citing TEX. R. EVID. 403).

Here, Medellin sought to exclude any reference specifically to his immigration status on the basis such evidence was not relevant under Rule 401 and any probative value it could have had was substantially outweighed by the danger of unfair prejudice under Rule 403. Nowhere in its brief does JMI argue the trial court abused its discretion by excluding evidence of Medellin's immigration status based on Rule 403. And despite the probative value of Medellin's immigration status, Texas cases, including the case cited by JMI, have recognized the probative value of the evidence is slight while "the prejudicial effect of this evidence is high," and as a result, a trial court's exclusion of the evidence under Rule 403 is not an abuse of discretion. *See Martinez*, 335 S.W.3d at 408–10 (holding evidence concerning Gomez's illegal status is somewhat relevant, but the prejudicial effect of revealing his status would be great and thus outweighed by unfair prejudice). Likewise, we conclude the same and hold the trial court did not abuse its discretion by excluding any reference to Medellin's immigration status under Rule 403.

## JURY ARGUMENT

JMI next asserts Medellin engaged in an incurable closing argument when his counsel made multiple references to Medellin as an "undocumented worker." According to JMI, Medellin's closing argument improperly made an appeal to ethnic bias by repeatedly describing Medellin as an "undocumented worker" and improperly asking the jury to award Medellin a "large sum of money" to send a message to the roofing industry and ultimately protect other "undocumented workers."

Trial counsel is permitted to argue "facts of the case to the jury" and "may properly discuss the reasonableness of the evidence as well as the probative effect, or lack thereof, of the evidence." *Wellons v. Valero Ref.-New Orleans, L.L.C.*, 616 S.W.3d 220, 231 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). Counsel is also entitled to "wide latitude in arguing the evidence and the reasonable inferences from the evidence to the jury." *Id.* And generally, "[c]ontrol over counsel during closing argument is within the sound discretion of the trial court and will not be disturbed absent clear abuse of that discretion." *Id.*

Ordinarily, a complaint concerning improper jury argument must be preserved by a timely objection and request for a jury instruction to disregard the remark. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009); *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam). This is because "[h]arm from improper jury argument is usually curable by a 'retraction of the argument or instruction from the court.'" *Alonzo v. John*, 689 S.W.3d 911, 913 (Tex. 2024) (quoting *Penalver*, 256 S.W.3d at 680). An objection, however, is not required if the argument "is deemed so prejudicial and inflammatory that its impact would not be curable by an instruction to disregard." *Wellons*, 616 S.W.3d at 232; *see Phillips*, 288 S.W.3d at 883; *Penalver*, 256 S.W.3d at 680–81. "Whether that threshold has been breached depends on 'the amount of harm from the argument.'" *Alonzo*, 689 S.W.3d at 913 (quoting *Penalver*, 256 S.W.3d at 681).

"Incurable jury argument is rare." *Phillips*, 288 S.W.3d at 883. "The test is 'whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict.'" *Alonzo*, 689 S.W.3d at 913 (quoting *Penalver*, 256 S.W.3d at 681). "This inquiry requires an evaluation of the case as a whole—beginning with voir dire and ending with closing argument—and includes an assessment of whether the complaining party invited or provoked the argument." *Id.*

In general, an argument striking "at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts is incurably harmful not only because of its harm to the litigants involved, but also because of its capacity to damage the judicial system." *Penalver*, 256 S.W.3d at 681. Examples of incurable arguments include (1) "appeals to racial prejudice"; (2) "unsupported, extreme, and personal attacks on opposing parties and witnesses"; and (3) unsupported accusations of "the opposing party manipulating a witness." *See id.*

During closing argument, Medellin's counsel made the following statements:

> Reybel Rodriguez, Rigoberto Rodriguez, Milton and his last name is kind of hard. I'll ask his last name because I don't remember Milton. He's from Honduras. So Raul Rodriguez, Damian Cruz, Christian Jimenez, Omar Castaneda and Pedro Castaneda and then Miguel Rigoberto. That's why they don't care. Because these guys don't have a voice. Guys from Honduras, my client who can't even be here today because we all know where he's at.

> . . . .

> What would other contractors do? And I can tell you. They probably would all do the same thing that JMI did because there hasn't been somebody in the community, somebody in the jury to give a big enough verdict that it grabs all of their attention. Because what they've got up there working are the guys from Honduras, they got Rigobertos, they got Juan Medellins that can't even be in their own trial. Because that's what they got working out there.

> . . . .

> And, yes, he's an immigrant and that's why he's not here. And I'm sure you're gonna have Mr. Taylor come up here and make a big deal about him not being here. We all know why he's not here. He's not here because he doesn't want to be here. I guarantee, he's been fighting this for three and a half years. We've been fighting this for three and a half years. And when we found out he was not gonna be able to be here, I looked at our team and we all said, we gave him our word. We keep going 'cause we believe in this community and we believe in people like yourselves that are representatives of this community.

> . . . .

> Why don't they get their taxes taken out? Why don't they get Social Security paid for them? Why don't get all these things that they should be getting and instead they give -- and I'll show it to you in a little bit….

. . . .

> Lastly, he says where are the records? Where are the records to show wages and all that stuff? It just shows how they don't get it. How this is so disassociated they are from the reality of what these workers live by. The reason Medellin doesn't have records is that 1099 that showed you, the Mike Garcia, Inc. funneling it through ANR, funneling it through Raul Rodriguez so that this guy can pay them either cash or pay them like that. That's why these guys don't have records because companies like him don't hire them. They got Social Security taxes, put them on 401K, on benefit plans, give them vacation pay. You saw, it's his company doing that to his workers and then he comes here and says, well, why do these workers not have wage statements, why do these workers not have proof of….

At no point did JMI object to these statements as improper or request a curative instruction. We therefore must determine whether they were so prejudicial and inflammatory, rising to the level of incurability. *See Phillips*, 288 S.W.3d at 883; *Penalver*, 256 S.W.3d at 680–81. When assessing the nature of these statements in context of the whole case, the statements constitute facts relevant to explaining why counsel's client was not present in the courtroom and why he could not provide documentation to help establish lost earnings. JMI, however, contends the statements are an appeal to ethnic unity intended to persuade the jury to deliver a verdict against it. For support, it relies on *Penate v. Berry*, 348 S.W.2d 167 (Tex. App.—El Paso 1961, writ ref'd). In *Penate*, the El Paso Court of Appeals held remarks describing the appellant as an "alien" and stating an "alien" "can't come into court and reach your hands into the pockets of an American citizen and take his property from him" constituted harmful error because it was a strong appeal to national prejudice. *Id.* at 168. JMI also relies on our decision in *Texas Employers' Insurance Association v. Guerrero*, in which we held counsel's request to the jury to "unite" and "stick together" amounted to an incurable appeal to ethnic solidarity. *See* 800 S.W.2d 859, 862–63 (Tex. App.—San Antonio 1990, writ denied).

Here, unlike the comments in *Penate* and *Guerrero*, counsel's references to Medellin's immigration status are not an appeal to the jury's national prejudice, nor are they an appeal to the

jury to unite based on ethnic solidarity. Instead, Medellin's immigration status was a relevant fact addressed by counsel to explain questions it anticipated the jury to have about his client's absence and his inability to produce certain evidence. Such an explanation was invited by JMI, stating during its opening statement Medellin bore the burden of proof to establish his damages. Additionally, to the extent counsel made an appeal to the jury to unite and award his client a "big enough verdict" to grab the roofing industry's attention, the appeal was nothing more than an appeal to administer justice. *See Phillips*, 288 S.W.3d at 883 (concluding counsel's jury argument to "send a message" to doctors because previous juries were not harsh enough in medical malpractice cases was not so extreme as to be incapable of cure).

Accordingly, we cannot conclude the references to Medellin's immigration status made during his closing argument were "so prejudicial and inflammatory that [their] impact would not be curable by an instruction to disregard." *See Wellons*, 616 S.W.3d at 232. When considered in their proper setting, the references were not reasonably calculated to cause such prejudice against JMI that a withdrawal by Medellin's counsel or an instruction by the court could not have eliminated the probability that it resulted in an improper verdict. *See Alonzo*, 689 S.W.3d at 913. In making this conclusion, we remain mindful "incurable jury argument is rare" and requires more than incidental references to a party's race or ethnicity. *See id.* at 912; *see also Guerrero*, 800 S.W.3d at 867 (explaining holding "does not encompass incidental references to the race of the parties and witnesses"). Here, the comments made by Medellin's counsel request a verdict based on the facts and evidence produced at trial, and any prejudice or harm made by those comments did not breach the threshold to make the harmfulness incurable. *See Alonzo*, 689 S.W.3d at 913. We therefore conclude the argument was not incurable in nature.

**SUFFICIENCY OF DAMAGES**

Finally, JMI challenges the sufficiency of the damage award, specifically arguing the evidence is legally and factually insufficient to support the jury's award for future lost earning capacity, past and future medical damages, past and future pain and suffering, past and future mental anguish, past and future physical impairment, as well as exemplary damages. JMI further contends the amounts awarded for noneconomic damages, specifically pain and suffering, mental anguish, and physical impairment, were excessive. It alternatively argues it is entitled to a remittitur in the event we do not order a new trial.

## A. Standard of Review

In considering whether the evidence is legally and factually sufficient to support the jury's damage award, we apply the well-established standards of review. Whether the evidence is legally sufficient to support the jury's finding of damages, we examine the record for evidence and inferences supporting the jury's finding and disregard all contrary evidence and inferences. *Tagle v. Galvan*, 155 S.W.3d 510, 517 (Tex. App.—San Antonio 2004, no pet.). If there is more than a scintilla of evidence to support the jury's finding, then the evidence is legally sufficient to support the jury's finding. *See id*. at 518. Whether the evidence is factually sufficient to support the jury's finding of damages, we consider all the evidence in the record, both for and against the jury's finding. *See id*. Evidence is factually insufficient if the jury's finding "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id*. As the trier of fact, the jury "determines the credibility of the witnesses and the weight to be given their testimony, decides whether to believe or disbelieve all or any part of the testimony, and resolves any inconsistencies in the testimony." *Id*. Accordingly, when there is conflicting evidence, we defer to the jury as the trier of fact. *See id*.

**B. Loss of Future Earning Capacity**

JMI argues the jury's award of $288,000 for loss of future earning capacity is not supported by legally and factually sufficient evidence. According to JMI, there was no evidence of Medellin's inability to work in the future, and the evidence conclusively shows he was able to return to work full-time two years after the accident.

"Lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury." *Hospadales v. McCoy*, 513 S.W.3d 724, 742 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The measure of damages is not assessed based on what a person earned, but instead by a person's *capacity* to earn. *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 553 (Tex. App.—Fort Worth 2006, pet. denied). Pertinent in this case, "[l]oss of future earning capacity is the plaintiff's diminished capacity to earn a living after trial." *Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex. App.—Amarillo 2006, no pet.); *see Tagle*, 155 S.W.3d at 519. Proof of lost earning capacity is always uncertain and is left largely to the jury's discretion. *Bituminous*, 223 S.W.3d at 491.

To support an award for damages for lost earning capacity, the plaintiff must present evidence sufficient to permit a jury to reasonably measure earning capacity prior to the injury in monetary terms. *See Tagle*, 155 S.W.3d at 519–20. Non-exclusive factors such as stamina, efficiency, ability to work with pain, the weakness and degenerative changes which naturally result from an injury and from long-suffered pain, and life expectancy are legitimate considerations in determining whether a person has experienced an impairment in future earning capacity. *Big Bird Tree Servs. v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.—Dallas 2012, pet. denied); *Perez v. Arredondo*, 452 S.W.3d 847, 862 (Tex. App.—San Antonio 2014, no pet.); *Tagle*, 155 S.W.3d at 519. "There must be some evidence that the plaintiff had the capacity to work prior to the injury, and that his capacity was impaired as a result of the injury." *Tagle*, 155 S.W.3d at 520.

Here, the evidence shows Medellin was 29 years old at the time of the accident and earned up to $200.00 a day as a skilled roofer. Specifically, Medellin testified during his deposition, before the accident, he worked for a variety of roofing companies for between $160.00 to $200.00 a day. The jury also heard testimony from Hernandez, who confirmed he paid Medellin on average up to $200.00 a day, for a $1000.00 to $1200.00 work week, as a skilled roofer. After the accident, however, Medellin testified he could not work a full work week or complete the same tasks due to his injuries. Hernandez further specified when Medellin returned to work, he could not immediately climb on ladders or roofs and would help by lifting materials. Hernandez testified, "little by little, he [] started getting up on the roofs[,]" but he did not work every day due to his injuries. He further testified there were times—as recently as December 2020—in which Medellin could not work "because of his injuries." Finally, the jury heard testimony from Dr. John Obermiller, who testified Medellin could expect to have pain, deficits, and limitations for the rest of his life because of his injuries. He specifically stated Medellin would face "long term medical issues that [would] affect[] his ability to work at the same level," and he could expect his leg and elbow not to have full range of motion.

Remaining mindful the measure of damages for loss of future earning capacity is not based on a person's past earnings, but instead on a person's capacity to earn, we conclude the jury could have inferred Medellin would be unable to resume his roofing work to his former ability. *See Dawson v. Briggs*, 107 S.W.3d 739, 750 (Tex. App.—Fort Worth 2003, no pet.) (holding jury could infer plaintiff sustained some lost future earning capacity damages based on testimony she would be unable to bend down, look up charts, or be on phone for extended periods of time). Here, although the evidence shows Medellin eventually returned to work, the jury also heard testimony indicating Medellin's capacity to work had been impaired as a result of his injury. By his own testimony, Medellin could not work full weeks or complete the same tasks. Thus, JMI's contention

Medellin returned to roofing work after the accident is irrelevant. *See Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 38 (Tex. App.—Tyler 2003, pet. denied) (reasoning evidence plaintiff returned to work and earned more money following the accident was irrelevant to award amount for future lost earning capacity). Furthermore, there is nothing in the record contradicting the jury's assessment of lost earning capacity and causing us to conclude an award of $288,000 to compensate Medellin for a reduction in future earnings due to his injuries is manifestly unjust. *See id.* (upholding jury's award for loss of future earning capacity when no contradictory evidence presented to indicate award was manifestly unjust); *see also Dawson*, 107 S.W.3d at 750 (upholding jury's award for future lost earning capacity because no contrary evidence existed). We therefore hold the evidence is legally and factually sufficient to support the jury's award for lost future earning capacity.

## C. Past and Future Medical Damages

JMI next contends the jury's award of $119,579.34 for past medical damages constituted error because it was based on inflated medical billing statements. To support its contention, JMI explains the trial court improperly excluded its medical billing expert, Mark Chapman, who was "clearly qualified" to opine about the practice of price adjustments made to medical billing statements such as the billing statements in this matter. JMI further contends the medical billing statements "should not have been admitted" because they were incomplete and unreasonable.

Here, JMI suggests the jury's award for past medical damages would have been reduced had it heard Chapman's testimony regarding price adjustments and had it not considered the admitted billing statements. However, other than asserting its expert was "clearly qualified" to testify and the billing statements "should not have been admitted," JMI fails to explain how the trial court erred in these evidentiary rulings. In this case, the trial court granted Medellin's motion to exclude Chapman's testimony, and the motion challenged the reliability of Chapman's opinion

under Texas Rule of Evidence 702. *See* TEX. R. EVID. 702 (authorizing witnesses to testify as expert if qualified based on knowledge, skill, experience, training, or education). The record also reflects Medellin supported the reasonableness and necessity of his medical expenses by relying on an affidavit pursuant to section 18.001 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 18.001 (governing the procedure of proving past medical expenses by affidavit); *Gunn*, 554 S.W.3d at 672 ("It is common to use section 18.001 affidavits as evidence of the reasonableness and necessity of past medical expenses."). Nowhere in its brief does JMI cite any authority regarding an expert's reliability or qualifications under Rule 702 or the requirements for an 18.001 affidavit. Thus, to the extent JMI contends the trial court erred by excluding its expert and admitting the billing statements, we hold its arguments are inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *see also Darmadi v. Harshman*, No. 01-09-00307-CV, 2010 WL 3448096, at *3 n.4 (Tex. App.—Houston [1st Dist.] Aug. 31, 2010, no pet.) (mem. op.) (holding any intent to appeal trial court's implicit finding expert was qualified to opine on issue was inadequately briefed because appellant failed to cite any authority regarding expert's qualifications).

Turning to the jury's award for future medical damages, JMI asserts Medellin failed to produce any evidence to support a recovery for future medical expenses. Texas follows the "reasonable probability" rule for damages for future medical expenses. *Tagle*, 155 S.W.3d at 517. To recover future medical expenses, "a plaintiff must produce evidence showing a reasonable probability that the expenses will be incurred in the future and the probable cost of such expenses." *Brazos Contractors Develop., Inc. v. Jefferson*, 596 S.W.3d 291, 311 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). "Although the preferred method of proving these expenses is through expert medical testimony, no precise evidence is required to support an award for future medical costs." *Id*. A jury can make an award for future medical expenses based on the nature of the

plaintiff's injuries, medical care rendered to a plaintiff before trial, and the condition of the plaintiff at the time of trial. *Bill Miller Bar-B-Q Enters., Ltd. v. Gonzales*, No. 04-04-00747-CV, 2005 WL 2176079, at *2 (Tex. App.—San Antonio Aug. 24, 2005, pet. denied) (mem. op.). "[A]n award of future medical expenses is a matter primarily for the trier of fact to determine." *Id*. "Because issues such as life expectancy, medical advances, and the future costs of products and services are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages." *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied).

Here, Medellin submitted copies of his outstanding medical expenses, totaling $119,579.34. This total amount included itemized charges for his medical appointments, pain medications, and physical therapy sessions. The jury also heard testimony from Dr. Obermiller, who was board certified in physical, medical, and rehabilitation, about Medellin's future expectations regarding medical treatment. He testified Medellin could expect to continue to experience pain in the future, and therefore, he should expect to consult a doctor for ongoing pain management. He further testified future pain management options could include medications, injections, physical therapy, or even surgery. Dr. Obermiller also explained Medellin may need to have the screws in his leg or plate in his elbow surgically removed in the event they ever become infected.

When considering this evidence under the appropriate standards of review, the jury was free to consider Dr. Obermiller's testimony in determining Medellin's need for future medical treatment. *See Gonzales*, 2005 WL 2176079, at *3 (concluding jury could consider testimonial evidence in determining the need for future medical treatment). The jury was also free to award future medical expenses based on the nature and extent of Medellin's injuries, Medellin's outstanding medical expenses, and Medellin's current condition. *See id.* at 2. Thus, contrary to

JMI's contention that Dr. Obermiller's testimony is insufficient to establish an exact amount for future medical expenses, no precise monetary amount was required. *See id*. We therefore conclude the evidence is legally and factually sufficient to support the jury's future medical expenses award.

### D. Past and Future Pain and Suffering

Texas courts, including this court, have recognized "[t]he process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Tagle*, 155 S.W.3d at 518; *see Sanchez v. Balderrama*, 546 S.W.3d 230, 237 (Tex. App.—El Paso 2017, no pet.). Because there is no precise mathematical calculation or objective analysis to calculate such damages, the jury is given wide latitude in determining the appropriate award amount. *Sanchez*, 546 S.W.3d at 237; *Tagle*, 155 S.W.3d at 518. We will not substitute the jury's calculation so long as sufficient probative evidence exists to support it. *Sanchez*, 546 S.W.3d at 237. "[W]e will set aside the verdict only where the record clearly indicates that the award was based on passion, prejudice, or improper motive, or is so excessive so as to shock the conscience." *Id*.

The jury awarded Medellin $500,000 for past pain and suffering and $800,000 for future pain and suffering. According to JMI, the jury award for past and future pain and suffering is not based on evidence, but rather the result of Medellin's incurable jury argument. However, as indicated above, Medellin's closing argument did not rise to the level of incurable jury argument, and a review of the record shows the jury heard the following probative evidence regarding past and future pain and suffering.

Dr. Obermiller testified Medellin sustained multiple fractures, specifically a peri-intertrochanteric femur fracture, interior wall acetabular fracture, inferior pubic ramus fracture, and olecranon fracture, as well as bilateral pulmonary contusions. As a result of his injuries, he underwent three surgeries to his leg and one surgery to his elbow. Dr. Obermiller described the

surgeries as invasive with Medellin's leg surgery requiring a long rod reamed into his femur and secured with screws, and Medellin's elbow surgery requiring his bone broken apart and fitted with a plate. Dr. Obermiller testified at one point, the screws and plate were removed due to complications, causing intense pain. Dr. Obermiller testified Medellin could expect to experience pain for the rest of his life as a result of the accident.

The jury also heard deposition testimony from Medellin, who testified he experienced significant pain after the accident. He testified, during family trips to Corpus Christi, he would experience pain and discomfort after sitting for extended periods of time in a car. He testified he was unable to drive on the trips. He also testified when he returned to work, he worked through the pain every day. During work, he would often tell his coworkers how much pain he felt. Medellin's coworkers and wife confirmed Medellin's account of his pain. Specifically, Hernandez testified he would stop and visit Medellin during his recovery, and he described Medellin as "desperate" because he was unable to work. He also testified he witnessed Medellin cry. Medellin's wife, Sandra Bracho, also stated he was visibly in pain, and his eyes would water when he tried to stand. When reflecting on their fourteen years of marriage, Bracho believed Medellin's recovery was the most painful thing he had ever experienced. She further testified due to his pain, he would complain, express anger, and push her and his daughter away. He sometimes told her he wanted to die because of how much pain he experienced, and as a result, she hesitated to leave him alone.

When viewing this evidence under the appropriate standards of review, we conclude sufficient probative evidence exists to support the jury's award. Here, the jury heard direct evidence regarding Medellin's pain and suffering, and the jury was also permitted to infer his pain from the nature of the injury. *See Sanchez*, 546 S.W.3d at 238 ("In the absence of direct evidence of pain, the jury is permitted to infer the occurrence of pain from the nature of the injury."). We

thus conclude the evidence is legally and factually sufficient and not based on passion, prejudice, or improper motive so as to shock the conscience as argued by JMI. *See Four J's Cmty. Living Ctr., Inc. v. Wagner*, 630 S.W.3d 502, 518–19 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) (holding award of $4 million for past physical pain and mental anguish and $1.5 million for future physical pain and mental anguish not excessive when supported by circumstantial evidence of plaintiff's physical pain).

### E. Past and Future Mental Anguish

"Texas permits recovery of mental anguish damages in virtually all personal injury actions, even where the defendant's conduct was merely negligent." *Sanchez*, 546 S.W.3d at 238. "Evidence of past pain and mental anguish may be proven through a plaintiff's testimony or other evidence, including circumstantial evidence." *Id.* For instance, an injured party's testimony explaining how he felt and how his life was disrupted can establish mental anguish. *Tagle*, 155 S.W.3d at 519. A party must produce "either direct evidence of the nature, duration, and severity of her mental anguish, thereby establishing a substantial interruption in her daily routine, or circumstantial evidence of a high degree of mental pain and distress that is greater in degree than mere worry, anxiety, vexation, embarrassment, or anger." *Id.*

Here, the jury awarded Medellin $800,000 for past mental anguish and $500,000 for future mental anguish. In support of this award, the jury heard testimony from Medellin's wife, who described how Medellin's life was substantially disrupted after the accident. She stated after he was discharged from the hospital, he was unable to do anything on his own, and she and their daughter had to help him stand and walk. She further explained she had to help him with other daily activities, such as using the restroom, bathing, and eating; many times, he could not sleep, and she had to move him in the middle of the night to the couch for a more comfortable position. She further testified two years after the accident, Medellin continued to struggle to sleep, and he

was unable to play with his daughter because he could not participate in common activities, such as jumping on a trampoline, riding a bike, or walking at the park. For example, a walk in the park often led to him having an uncomfortably swollen knee, and they would have to leave the park. When viewing this evidence under the appropriate standards of review, we disagree with JMI's contention this evidence is legally and factually insufficient. This testimony is direct evidence demonstrating the nature, duration, and severity of Medellin's anguish by detailing the substantial disruption to his daily life; we therefore conclude it is legally and factually sufficient to support the jury's award for past and future mental anguish.

## F. Past and Future Physical Impairment

JMI next asserts the evidence is legally and factually insufficient to support the jury's award of $100,000 for past physical impairment and $100,000 for future physical impairment. According to JMI, Medellin failed to produce any evidence showing he was unable to participate in sports, hobbies, or other recreational activities. For support, it relies on cases in which the injured plaintiff was unable to resume former activities like playing racquetball or the saxophone. *See S. Pac. Transp. Co. v. Harlow*, 729 S.W.2d 946, 950 (Tex. App.—Corpus Christi 1987, writ denied); *Tex. Farm Prods. Co. v. Leva*, 535 S.W.2d 953, 957 (Tex. App.—Tyler 1976, no writ).

Texas law provides "[p]hysical impairment includes the loss of enjoyment of life." *Casas v. Paradez*, 267 S.W.3d 170, 188 (Tex. App.—San Antonio 2008, pet. denied) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003)). "To recover for physical impairment, a plaintiff must show that (1) the effect of any physical impairment was substantial, and (2) the incurred injuries are distinct from, or extend beyond, any pain, suffering, mental anguish, lost wages, or diminished earning capacity." *Id*.

Here, the jury heard testimony detailing Medellin was unable to engage in daily activities, such as sitting, standing, walking, or playing with his daughter for extended periods of time. Both

Bracho and Hernandez testified Medellin was not happy because he loved to work and did not like sitting around and doing nothing. Medical records, including testimony from Dr. Obermiller, also detailed Medellin's inability to have full use of his body; specifically, Dr. Obermiller testified Medellin would have less strength in his injured leg, less range of motion, less grip in his arm, and difficulty lifting for the remainder of his life due to the accident. Accordingly, when viewing this evidence under the appropriate standards of review, we conclude the evidence is legally and factually sufficient to establish Medellin's loss of enjoyment of life, and therefore, supports the jury's award.

### G. Exemplary Damages

Finally, JMI contends the jury's award for exemplary damages is legally and factually insufficient because Medellin failed to produce any evidence regarding JMI's net worth. According to JMI, the jury awarded exemplary damages primarily because during closing, Medellin "told the jury just to write a big number." It further asserts the exemplary damages award should be reversed because Angelini was not grossly negligent.

Exemplary damages are damages awarded as penalty or punishment for certain behavior. TEX. CIV. PRAC. & REM. CODE § 41.001(5) (defining exemplary damages as "damages awarded as a penalty or by way of punishment but not for compensatory purposes"). They may be awarded only if the claimant proves by clear and convincing evidence the harm with respect to which the claimant seeks recovery results from fraud, malice, or, as in this case, gross negligence. *Id*. § 41.003(a). "The determination of . . . the amount of exemplary damages to be awarded is within the discretion of the trier of fact." *Id.* § 41.010(b). In determining the amount, the trier of fact shall consider evidence relating to:

> (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant.

*Id*. § 41.011(a).

Here, the jury awarded $1,000,000 in exemplary damages based upon the gross negligence finding as to Angelini, and JMI attacks the sufficiency of the damage award by contending there is no evidence of JMI's net worth. Although evidence of a defendant's net worth is relevant, there is no statute or case law defining a defendant's net worth as a necessary element for the recovery of exemplary damages. *Durban v. Guajardo*, 79 S.W.3d 198, 210–11 (Tex. App.—Dallas 2002, no pet.) ("Nothing in chapter 41 of the Texas Civil Practice and Remedies Code, *Moriel*, or other Texas case law indicates that evidence of the defendant's net worth is a necessary element for the plaintiff to recover any exemplary damages."). Moreover, to the extent JMI argues the jury's award of exemplary damages was based on an incurable jury argument or an insufficient gross negligence finding, we disagree; we conclude Medellin's counsel did not engage in an incurable jury argument, and the evidence is legally and factually sufficient to support the jury's finding Angelini was grossly negligent. Accordingly, we overrule JMI's final sufficiency challenge.

## CONCLUSION

Based on the foregoing, we affirm the trial court's judgment.

Luz Elena D. Chapa, Justice